# CHARLESTON.

## W. A. VAUGHAN v. MEMORIAL HOSPITAL

### (No. 5759).

Submitted February 1, 1927. Decided February 8, 1927.

1.  APPEAL AND ERROR—*Setting Aside Verdict For Admitting Misleading Evidence Will Not be Disturbed, Unless Plainly Unwarranted.*

    Where a trial court has set aside a verdict because of the admission of evidence which tended to confuse and mislead the jury on the controlling issue, peculiar weight is accorded to the trial court's order, and it will not be disturbed unless plainly unwarranted.   (p. 160).

    (Appeal and Error, 4 C. J. §§ 2813, 2821.)

2.  PHYSICIANS AND SURGEONS—*Jury Should be Instructed to Give Peculiar Weight to Evidence of Surgeons in Determining Issue of Reasonable Care in Treatment.*

    In the trial of a case of malpractice against a surgeon, the controlling issue being whether he has exercised reasonable and ordinary care, skill and diligence, such as accords with the usual standards of the profession as practiced by accredited surgeons in the same or similar localities, an instruction should be given, if offered, telling the jury the peculiar and controlling weight it should give to the evidence of sur-

geons in determining whether defendant has used such ordinary and reasonable care, skill and diligence in the treatment. (p. 162).

(Physicians and Surgeons, 30 Cyc. p. 1588.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Mercer County.

Action by W. A. Vaughan against the Memorial Hospital for malpractice. A verdict for plaintiff was set aside, and he brings error.

*Affirmed.*

*Hugh G. Woods,* for plaintiff in error.

*Hartley Sanders* and *Reynolds & Reynolds,* for defendant in error.

LIVELY, JUDGE:

W. A. Vaughan recovered a verdict for $4,695.00 against defendant, which was set aside by the trial court for error in the admission of evidence, and from that order Vaughan prosecutes error, asserting that no reversible error was committed in the trial.

This case was here before on a verdict for plaintiff set aside by the trial court, and was affirmed on the ground that plaintiff having relied upon the fact in the former trial that by reason of the broken bones in the foot not being properly set by defendant's physicians and surgeons, pus generated at the fracture and caused the break to decay, and having failed to produce evidence of the physician, Dr. Walker, who later amputated the bones, to show that there was actually pus present in the fracture, a fact material to the issue, the trial court was justified in setting aside the verdict and granting a new trial. *Vaughan* v. *Hospital,* 100 W. Va. 290.

On the new trial Dr. Walker's deposition was read to the jury, certain questions and answers therein being objected to by defendant but read to the jury over objection, and the court on motion to set aside the verdict, came to the conclusion that error had been thus committed, and set aside the verdict on that ground. Vaughan's counsel says these questions and answers were admissible; while defendant's coun-

sel says they were highly prejudicial, and in addition thereto the failure to give instructions offered by defendant are cogent grounds on which the order setting aside the verdict may be based.

Vaughan, a coal miner, was injured by a fall of slate on April 5, 1923, which broke two metatarsal bones in his right foot near where they joined the toes, and bruised and abraded the foot. Two days later he was admitted to defendant hospital for treatment. The foot was swollen to about twice its normal size, and at two places, one between the great toe and the next, and the other between the little toe and the next, was exuding serum and pus.

The first treatment given was to stop the infection and reduce the swelling, the doctors fearing that through infection and blood poisoning the patient might lose his foot, leg or his life. An X-ray was immediately taken, which located the fracture and the relative position of the broken bones. The proper bandages and antiseptics were applied, and a wire net or splint placed on the foot. The treatment was successful, and the swelling was greatly reduced, and the infection thought to be under control at a period of about seven days. Then a plaster cast was put around the leg from below the knee around the ankle and foot, immobilizing it, extending on the bottom of the foot to where the toes join the foot, but leaving the upper part of the foot open for inspection. The patient was then allowed to go home, where he remained two or three weeks. When he returned, the swelling had further subsided, and another like cast was used. The patient in due time came back and the second cast was removed. The foot was then subjected to physical examination as well as examination by X-ray and fluroscope, and the bones were found to be in proper union. The patient was then discharged from treatment with instructions as to the use of his foot, and told to consult his local physician, Dr. Craft, and not to return to the hospital unless directed so to do by Dr. Craft. Plaintiff went home, and he says that his foot remained painful and he was unable to use it. He says he

consulted Dr. Craft, who told him his foot was doing very well, and that he need not go back to the hospital.

About three months after his discharge from the hospital, plaintiff went to Matoaka and had an X-ray taken, which showed that the bones were not together. He then went to Charleston, West Virginia to the Mountain State Hospital, where after an X-ray and examination it was found that the heads of the two metatarsal bones were projecting downward towards the sole of the foot, and there was a non-union. An operation was performed, and these two bones were removed and a small portion of the ends of the metatarsal bones were cut off, because there was evidence that they were not in a healthy condition and were undergoing necrosis. Since that time plaintiff's foot pains him, and swells when he attempts to do manual labor requiring the use of the foot, such as standing or lifting.

The acts of negligence in treating the foot which plaintiff's counsel says were committed, and which warrant the verdict, are: that the plaster of paris casts did not extend far enough to support the broken bones; that the bones were not set so that they would knit together; that there was pus in the fracture at the time he was discharged from the hospital. That the casts did not extend far enough to support the fracture, we have the evidence of plaintiff, while the doctors say that they extended beyond the fractured bones. But it appears that these casts served their purpose, for when the last one was removed, an examination was made both by X-ray and fluroscope, as well as by physial examination, and the bones were then in proper position and a union had begun. No one says otherwise; and the only circumstance which says they were not properly set and were not united is, that in about three months afterwards, plaintiff being at home most of the time and moving around, an X-ray made by Dr. Cald-well showed the bones were not then united, and plaintiff had suffered pain when attempting to use the foot. To prove that there was pus in the foot at the time he left the hospital, plaintiff relies upon the evidence of Dr. Carr, who was present at the time of the discharge from the hospital, and who

made a casual examination of the naked foot and found it somewhat swollen, and who said to plaintiff on that occasion that it looked to him that the foot might have pus in it. He would not say at the trial that the foot had pus in it; only that it looked that way to him. He said it was not unusual for broken feet or limbs to be swollen while the cure is being effected and frequently for some time after. With this impression made upon Dr. Carr by his casual examination is coupled the fact that the foot did not get well, and by X-ray made by Dr. Caldwell about three months later it was found that the bones were not knit, and there was a fracture showing, plaintiff's counsel argues that the jury was warranted in saying that there was in fact pus in the foot when the patient was discharged. That was the argument made when the case was here before, and it was pointed out that the evidence of Dr. Walker, who performed the amputation, was important to show whether there was evidence of pus at the time of the amputation. The case went back because of the absence of Dr. Walker's evidence. On that point Dr. Walker says, ''There was no pus about the bones at all—no abscess about the bones.'' He says the foot was swollen and painful, and he thought an operation was best. He said the bones showed symptoms of having suffered osteoporosis, which is the result of or is caused by non-use of the bone, and that pus does not cause this result. Hence it will be seen that the negligence complained of is not very satisfactorily shown. An instruction to find for defendant was offered and refused. No cross-error is assigned. Defendant is standing on the order setting aside the verdict.

As before stated, the trial court set aside the verdict on the ground that certain hypothetical questions to Dr. Walker and the answers thereto went to the jury over objection. We will state these questions and answers.

Q. ''Doctor, assuming that this patient, Vaughan, entered the Memorial Hospital at Princeton on about the 7th day of April, the accident having occurred on the 5th, what would have been the proper treatment, taking into consideration the science of surgery at this time and in this State and

at Princeton and Charleston—what would have been the proper treatment of that foot to have gotten the bones to unite and gotten a permanent cure of his foot?'' (Objection by defendant). A. ''It would be to reduce the bones and hold them in position.'' Q. ''How would that have been done, and how should it have been done?'' A. ''Well, you take different men, use different methods of doing that. I usually try to reduce those bones as well as I can and apply a cast well moulded into the arch of the foot.'' Q. ''These bones were broken in this foot, as you saw, and assuming that a wire cast or wire net of some kind was placed upon the foot for something like four or five days or a week, and that was removed and plaster of paris cast put upon it, how far out on the toes should that cast have extended?'' (Objection by defendant). A. ''I personally would have it extended out to include the toes, just so the tips of the toes would have been left exposed.'' Q. ''I will ask you to state, Doctor, if a proper treatment would have been to have put the cast on so it would extend just to the injured parts, or should it have gone over the injured parts, so as to have given rest?'' (Objection by defendant). A. ''It should have extended beyond the injured or fractured bones.'' Q. ''What would have been the effect upon the injured part if the cast had gone just to the break and not beyond it?'' (Objection). A. ''It would not have held the bones in proper position. I don't see how it could do that.''

It is clear that these questions and answers did not contain all the facts, conditions and circumstances claimed by either party, and which prompted the treatment given plaintiff by the surgeons at Memorial Hospital. In stating a hypothetical question the hypothesis must be based on a state of facts which the evidence in the case tends to prove. *Kerr* v. *Lunsford,* 31 W. Va. 659. The object of this opinion evidence was to show that in the treatment of the fractured bones the defendant did not exercise such ordinary skill and diligence as is ordinarily used by the average surgeon in good standing in similar localities and in the same general line of practice, regard being had as to the state of medical science at the time.

To make such opinion evidence of probative value it should be based on the pertinent facts and not upon a portion of them which would call for a totally different treatment. No mention is made of the bad condition of the foot when plaintiff was taken for treatment. It was swollen to twice its size, was lacerated, exuding pus, and it was infected and in a dangerous state. In other questions propounded and · answered a fuller statement of facts and theories having support in the evidence were incorporated by counsel for both parties; but the questions and answers above quoted were clearly improper in view of the uncontroverted facts, and would tend to confusion, and possibly mislead the jury on the main issue. The trial judge so concluded. We have often said that an order setting aside a verdict is entitled to peculiar weight and will not be reversed unless plainly erroneous. *Miller* v. *Insurance Co.*, 12 W. Va. 116; *Black* v. *Thomas*, 21 W. Va. 709; *Reynolds* v. *Tompkins*, 23 W. Va. 229; *Coalmer* v. *Barrett*, 61 W. Va. 237. The reason for this rule is commented upon in *Shipley* v. *Ry. Co.*, 87 W. Va. 139, 144. The trial court notes the conduct of the jurors, parties and witnesses at the tiral, and this element often enters into consideration by the trial court when it uses its discretion in awarding a new trial. And we have often said that it takes a stronger case to reverse an order granting than to reverse an order refusing a new trial. *Vaughan* v. *Hospital*, 100 W. Va. 290. Under these principles we are not disposed to disturb the order.

The controlling question which should not be lost sight of in the trial was, did defendant use the same degree of reasonable and ordinary care, skill and diligence in the treatment of the fractured bones as physicians and surgeons in the same general line of practice would have used, time and locality being taken into consideration? There was no contract to exercise the highest degree of care, skill and diligence known to the profession; nor was there a contract of insurance that a perfect cure would be effected. *Lawson* v. *Conway*, 37 W. Va. 159; *Dye* v. *Corbin*, 59 W. Va. 266. In the last cited case it is held that where a physician exercises ordinary skill and

diligence, keeping within recognized and approved methods, he is not liable for the result of a mere mistake of judgment. Obviously it was necessary to ascertain in this case what would have been the usual care, diligence and skill of the average members of the profession in the locality or similar localities in the same line of practice, regard being had to the state of medical and surgical science at the time. Then, did defendant meet that standard of degree and care? In determining these questions the evidence of the physicians and surgeons should have peculiar weight. The ordinary layman does not know whether a particular surgical treatment accords with the standard or usual treatment sanctioned by the profession in that or similar localities. The patient cannot fix a standard of his own; neither can the jury. Defendant offered and was refused an instruction which would have told the jury that it was bound by the evidence of the physicians who testified, in determining whether defendant's physicians exercised such reasonable and ordinary skill and diligence as is ordinarily exercised by members of the medical profession in good standing in similar localities in the same line of practice, regard being had as to the state of medical science at the time. No other instruction pointed out to the jury how it should arrive at the determination of that question. While the word "bound" used in the instruction is probably too broad, we think an instruction embodying the peculiar weight which should be accorded to evidence of members of the profession regarding the usual care and diligence exercised by its members, should have been given. The fact that plaintiff's fracture was treated, and the ultimate result was that the bones did not unite, is not prima facie proof of negligence. The doctrine of *res ipsa loquitur* does not apply. The negligence of a surgeon is ascertained by pointing to something he should have done or did do which was not in accord with reasonable care and diligence as practiced by the accredited members of the profession in that locality or similar locality; and is not ascertained by the results. For a surgeon may use the best judgment, skill and care, using all the recognized means available, and yet not effect a cure. The evi-

dence to be considered by the jury in determining whether a surgeon has exercised ordinary care and skill in accord with usual and accepted standards of the profession, was pointed out in *McGraw* v. *Kerr*, 128 Pac. (Colo.) 870. In that case an instruction somewhat similar and embodying the same principle as the one refused in the instant case, was offered and the court said it should have been given. The court embodied in its decision the following: ''The authorities are practically uniform in holding, and counsel for plaintiff admits, that as to what is or is not proper practice in examination and treatment, or the usual practice and treatment, is a question for experts, and can be established only by their testimony. But counsel for appellee attempts to draw a distinction between the character of testimony necessary to establish a standard of proper treatment, and a standard of what constitutes ordinary care and skill. We perceive no difference. The instruction goes no farther than to direct the jury in what is admitted by plaintiff's counsel to be the law. In either case the standard must be established by the testimony of experts. In *Jackson* v. *Burnham, supra,* the court, by Mr. Justice Goddard, said that, in order to determine whether the defendant (a surgeon) exercised ordinary care and skill in examining the case, as well as in applying remedies thereafter, resort must be had to the opinion of experts, based upon the ultimate facts as the jury may find them established by the weight of the evidence. The only rule asked for in the language of the instruction now under consideration is that, upon the question of standard, by which the jury must be guided in arriving at a conclusion as to what constituted care and skill, the testimony of experts (in this case, the physicians) alone must be considered. The standard, and the testimony by which it can be ascertained are the only matters involved. Upon that question we think there is no contrariety of opinion. If no standard was established by the testimony of physicians, then the jury has no standard. This does not militate against the right of the jury to decide between conflicting testimony of different physicians or experts on the question of a standard; it only goes to the extent that, if in doubt upon any matter necessary to

enable the jury to say that a standard has been fixed for its guidance by the testimony of such qualified witnesses, then it cannot from other and incompetent evidence, or without evidence, raise a standard. We think that refusal to give this instruction, and the giving of the instruction as modified by which the jury was permitted to find such standard from all of the testimony, both competent and incompetent as to that question, constituted error." See also *Perkins* v. *Trueblood,* 181 Pac. (Sup. Ct. Cal.) 642; *Houghton* v. *Dickson,* 29 Cal. App. 321, 155 Pac. 128; *Scherer* v. *Eidenmuller,* 187 Pac. (Cal.) 445; *Moline* v. *Christie,* 180 Ill. App. 334; *Phebus* v. *Mather,* 181 Ill. App. 274; *Wurdemann* v. *Barnes,* 92 Wis. 206.

The judgment of the trial court will be affirmed.

*Affirmed.*