WILLIAM MAXWELL, *An Infant, etc., v.* W. H. HOWELL

(No. 7866)

Submitted March 7, 1934.   Decided March 27, 1934.
(Rehearing Denied June 13, 1934)

772

*Posten, Glasscock & Posten* and *Wm. S. John,* and *Erskine, Palmer & Curl,* for plaintiff in error.

*Kermit R. Mason* and *Chas. T. Herd,* for defendant in error.

WOODS, PRESIDENT:

This is an action for malpractice. Defendant prosecutes error to a judgment entered on a jury verdict against him.

On the night of March 25, 1932, the plaintiff, then sixteen years of age, was struck by a hit and run motorist, thereby suffering a simple comminuted fracture of the middle third of the right femur, with no cut or laceration of the skin. Thirty minutes later he was taken to the Monongalia County Hospital, and placed under the care of the doctor on duty, who rendered such attention as was then necessary. The following morning, defendant, the company doctor for the Rosedale Coal Company, with which the father of the injured boy was then employed, learned of the injury, and, after discussing insurance payments under group insurance carried by the company for its employees and their dependents, took over the case. An x-ray was taken, and thereafter the injured limb was prepared for reduction. On March 31st, the defendant made a ten-inch incision on the right thigh, exposing the ends of the broken femur and attempted to reduce the fracture by placing the broken ends in juxtaposition and inserting a beef bone peg within the femur at the point of the fracture. The incision was thereafter brought together by stitches, the leg bandaged where incised, and a board about four feet in length running from just above the hip to the ankle on the right side and which was held by a bandage around the middle of the body and at the ankle, used as a splint.

On the fourth post-operative day, there was an abnormal rise in temperature, indicating infection. However, nothing was done to relieve the high temperature. Five days later, the stitches were removed, and the defendant observed unmistakable signs of infection at the place of the incision. No further action was taken until April 13th, when the splint was removed. And on the 15th, the wound was incised and a large amount of pus drained therefrom. Drainage was continued, and on April 30th irrigation was resorted to. About May 1st the leg, at the place of the fracture, showed angulation, and that the bones were not in place, and on May 10th an x-ray (the first since the operation) was taken. Apparently nothing was done thereafter, except occasionally to drain and irrigate and dress the wound, until July 18th when a second incision was made. On July 24th, another x-ray was taken for the purpose of determining the amount of bone decay. During all this time the patient was suffering from a very high temperature, except on a few occasions when it was sub-normal. From the date of the entry at the hospital to August 7th, the patient's weight had decreased from 150 pounds to 80 pounds. The father, as early as the middle of July, requested to be allowed to furnish another surgeon to assist in the treatment of his son, but defendant refused. On August 7th (defendant having been formally dismissed), Dr. Dorsey Brannon took charge of the case, and after consultation with several physicians practicing in Monongalia county, amputated the patient's leg just below the hip. And on September 1st, the patient was discharged from the hospital.

The declaration and the evidence introduced in support thereof show that the plaintiff bases his cause of action on two theories, first, that it was the duty of the defendant to follow a method established and approved by physicians and surgeons generally in the community in which he performs the operation or gives the treatment, at the time thereof, or like communities, in treating a case of this kind, and not be negligent or careless in its application; second, the defendant was guilty of negligence in the treatment after the operation.

The defendant contends that in view of the testimony in reference to the open method in reducing a fracture of the shaft of the femur, the trial court erred (1) in not finding

such to be an approved method, as a matter of law, and (2) in permitting evidence regarding the closed method or a comparison of the two methods, to go to the jury. The evidence of the experts was to the effect that the adopted and approved practice, at the time, in Monongalia county, and similar localities, in cases of fractured femurs, was first to try to reduce the fracture by such well known and universally used methods as traction, manipulation, or some extension process, and that the open or operative method, due to the great danger of infection, was resorted to only after the foregoing had been tried and exhausted without success; that where the fracture is simple (the broken ends of the bone not protruding through the skin), there is all the more reason for trying non-operative methods first.

It appears that about fifty physicians and surgeons were practicing in Morgantown at the time of the operation in-, volved, and that in the last few years, out of all operations performed for broken femurs approximately eight were open reductions—the defendant having performed five. Of the latter number, three were in cases of broken necks of the femur, and two of the shaft (the instant case being one). Dr. Pride, who had performed one of the other three open reductions, had first exhausted the non-operative method, and in the other two, both compound fractures, it was not shown if traction was first resorted to. Not a witness, including defendant, testified to a single open reduction for the purpose of reducing a simple comminuted fracture of the shaft of the femur, that he had performed or known of anyone else having performed, except the instant case. In other words, the evidence showed that the prevailing method in the vicinity was to use non-operative methods, and, if they failed, then to resort to the open method. Hence we conclude that the defendant's position in regard to the exclusion of all evidence relative to non-operative methods, was not well taken.

The law is well settled in questions of malpractice in this state. *Lawson* v. *Conway,* 37 W. Va. 159, 16 S. E. 564; *Dye* v. *Corbin,* 59 W. Va. 266, 53 S. E. 147; *Browning* v. *Hoffman,* 86 W. Va. 468, 103 S. E. 484; *Meadows* v. *McCullough,* 101 W. Va. 103, 132 S. E. 194; *Vaughan* v. *Memorial Hospital,* 103 W. Va. 156, 136 S. E. 837.

In *Browning* v. *Hoffman, supra,* it was held that if there

are two or more approved methods of treatment of an injury committed to his care, the surgeon may adopt the one which, in his honest opinion, will be the more efficacious and appropriate under all the circumstances, and in such case he is not liable for any injury resulting from an error in his judgment, if there be one. He is not bound at his peril to adopt the best method. The foregoing statement is indicative of the rule established in the cited cases.

The experts generally agreed that according to their view the injury in question could have been properly treated by the "closed" or non-operative method. However, the defendant was not without support in his contention that the selection of the method in a particular case was a matter for determination of the best judgment of the attending physician.

The trial court left it to the jury to determine whether or not defendant used a recognized and established method. By plaintiff's instruction No. 5, the jury were instructed that it is the duty of a physician or surgeon to adopt in the treatment of a case a method established and approved by physicians and surgeons generally in the community in which he performs the operation or gives the treatment at the time thereof, and that if they believe from the evidence in this case that the defendant did not adopt an approved and established method of treatment of a fractured leg such as the plaintiff was suffering with at the time the treatment was administered, or if they further believe from the evidence in this case that the defendant was negligent or careless in the application of the treatment of the said injury and did not use the degree of care employed by physicians and surgeons generally in the said treatment as was used in the community in which he performed the operation or treatment at the time thereof then their verdict should be for the plaintiff. The foregoing instruction, and No 7, which is to like effect, were proper under the evidence. They are in accord with the law laid down in the cases hereinbefore cited.

But did the defendant use the due care incumbent upon him in treating his patient? This was the real test in the case.

The doctors who were consulted at the time Dr. Brannon took charge were agreed in the fact that unless the patient's

entire limb was amputated he would die. While it is true that such testimony does not of itself establish negligence, yet it is a circumstance which the jury had a right to take into consideration in determining whether the defendant was guilty of negligence. 21 R. C. L. 406; 3 Jones, Com. on Ev., p. 2460; *Barker* v. *Ohio River R. Co.*, 51 W. Va. 423, 41 S. E. 148; *Huber* v. *Hamley*, 122 Wash. 511, 210 Pac. 769; *Sawdey* v. *Ry. Co.*, 30 Wash. 349, 70 Pac. 972, 94 A. S. R. 880.

With the exception of the defendant the doctors seem to have been of one mind in regard to the impracticability of the four foot plank, all stating that they would have resorted to splints or cast to insure immobility of the limb. It also appeared that it was the practice to take an x-ray immediately following an operation of this character in order that it might be ascertained if the bone was in place and without angulation. The x-rays offered in evidence showed that the broken ends of the femur were overlapping to considerable extent, and that the beef bone peg was in the distal fragment, the blunt or upper end, which should have been in the proximate fragment, being practically flush with the broken end of the distal fragment, and pointed end two or three inches from the knee. From the position of the broken fragments as well as the location of the peg, it was apparent that no real recovery could be had.

According to the plaintiff's testimony the defendant had neglected him for as much as five days at one time and eight days at another, during all of which time plaintiff was undergoing much agony. While the defendant denies such neglect, the plaintiff is corroborated by another patient located in close proximity to him, and by one of the nurses. This is a jury question and their verdict on the matter must be upheld. The expert witnesses were all agreed that, considering the condition of the patient, the surgeon should at least visit him once a day.

The court, on motion of the defendant, gave sixteen instructions carefully embodying the law of malpractice as applied to the case under consideration. The plaintiff was limited to seven, which include the two hereinbefore mentioned. We perceive no error in any of them.

Without dealing specifically with any of the other errors relative to the introduction of evidence, it suffices to say that

we are satisfied from a consideration of the record that the defendant received a fair and impartial trial. The judgment is therefore affirmed.

*Affirmed.*