BUNAH N. WHITE

*v.*

THOMAS W. MOORE, *Administrator, etc.*

(No. 10281)

Submitted September 26, 1950. Decided October 31, 1950.

*Fitzpatrick, Strickling, Marshall & Huddleston, C. W. Strickling,* and *Bert H. Early,* for plaintiff in error.

*William W. Roberts,* for defendant in error.

GIVEN, JUDGE:

The plaintiff, Bunah N. White, obtained a verdict and judgment in the Circuit Court of Cabell County for $4,-500.00 against Thomas W. Moore, Administrator, *cum*

*testamento annexo,* of the estate of Joseph Hallock Moore, a physician and surgeon specializing in the examination and treatment of diseases of the ear, nose and throat. The declaration alleges negligence and lack of professional skill on the part of Dr. Moore in making an examination of the throat of plaintiff. This Court granted a writ of error to review the action of that court. The assignments of error are that the trial court erred in overruling "defendant's motion for a directed verdict and in allowing the case to go to the jury" and in overruling "defendant's motion to set aside the verdict of the jury and award him a new trial". The assignments of error make it necessary that the evidence be fully stated.

In November, 1946, plaintiff became ill and was "coughing up blood". She sought the advice of Dr. Richard Stevens, a physician practicing in the City of Huntington, who, after a preliminary examination of plaintiff, advised her to go to St. Mary's Hospital, in Huntington, for a "general check-up", which she did, arrangements for hospital admittance having been made by Dr. Stevens. Dr. Moore, a member of the staff of the hospital, and Dr. Stevens, after further examination and consultation, decided that what is known as a bronchoscopy should be performed upon the plaintiff, the plaintiff consented thereto, and Dr. Moore performed the examination at St. Mary's Hospital, on the 3d day of December, 1946.

The record discloses that a bronchoscopy or bronchoscopic examination is a "delecate procedure" requiring a "highly specialized surgeon to perform" it for proper results. There appear to be different methods used in the making of such examinations. It is probable, but not at all certain, that Dr. Moore used, in connection with his examination of plaintiff, what is known as the "Jackson and Jessberg bronchoscope". This instrument is constructed in a tube-like manner with a "light on the proximal end and apertures on each side of the bronchoscope so that the patient can continue to breathe from the other lung in case you are in the opposite lung." The light is

built into the bronchoscope but has a "separate tube along the side of the scope with the small light bulb at the end and the connection to the scope at the handle of the scope, near the operator." It also appears that some physicians, in making such an examination, first pass a tube known as a laryngoscope "as far as the epiglottis or the larynx" and then pass the "bronchoscope through the laryngoscope."

Plaintiff went to the hospital on the 29th of November, 1946, and remained there until the 4th day of December, 1946. The bronchoscopic examination revealed that a "dilated vein just below the vocal cords" was causing the hemorrhage or the coughing up of blood. It was made with the aid of a local anaesthetic only, and plaintiff remembers at least part of the circumstances connected with the examination. She remembered and testified that Dr. Moore performed the examination, that two interns and a nurse were present at some time during the examination, and that the two interns and the nurse looked "through the bronchoscope into her throat". After the examination the plaintiff's voice continued hoarse to such a degree that she could talk very little. She again consulted Dr. Stevens, who advised her to return to Dr. Moore for further examination and treatment, which she did. Dr. Moore continued to treat plaintiff's throat condition until about April 24, 1947. He died about August 3, 1947.

After the death of Dr. Moore plaintiff consulted Dr. Marple, of Huntington, about the hoarseness and throat condition and was advised by him to consult with Dr. Robert E. Howard, of Cincinnati, Ohio, an ear, nose and throat specialist, which she did, and was examined by him on the 24th day of November, 1947. This examination revealed that plaintiff's "left vocal cord, posterior half, seems to have been separated from the remaining part of the cord and this extra tissue does not approximate the right cord". At that time Dr. Howard advised plaintiff that an operation should be performed for the "removal of this extra tissue so that some voice might be restored".

Dr. Howard was further asked: "Q. In your opinion would it require some instrument of some kind to have produced that prominence?"; to which he answered: "A. Yes. It is difficult to determine what has caused this cord to be in the condition that it is without having seen the case from the first." He further stated that he "had not seen the patient before the operation done in December of '46"; that "I can not say whether this condition was present at the time or previous to the time of operation". Dr. Howard further testified to the effect that one of the big problems in connection with such an examination is to prevent "the larynx from going into spasm during the procedure"; that "Occasionally you have a laryngospasm from just the introduction of the instrument into the larynx"; that such a "spasm occurs at times, and it is necessary at that time to give the patient an airway, and you may sacrifice or cause trauma to tissue that you wouldn't otherwise cause of the patient having a desperate demand for air"; that he could see no cause to infer any chance for injury resulting because of the lapse of "fifteen, twenty or twenty five minutes" between the time of the insertion of a laryngoscope before a bronchoscope could be procured to complete the examination, and that such a delay "frequently happens". The following questions were asked Dr. Howard, to which he answered as follows:

"Q. Doctor, you speak of giving a patient air when performing a bronchoscopy. When is that necessary and what conditions require it?

"A. That is necessary when the patient goes into a laryngospasm and has difficulty in getting her exchange of air.

"Q. You say when that condition exists that the examining physician has to force the instrument through the larynx?

"A. When that condition exists there are two things that can be done. One is to create an airway through the larynx by placing a bronchoscope between the vocal cords. The other way

of preventing the patient from dying on the table
is to perform a tracheotomy and open into the
windpipe from the outside."

On March 4, 1949, the plaintiff, after further examina-
tion at the Cleveland Clinic, Cleveland, Ohio, submitted
to a surgical operation by Dr. Harris, of that institution,.
for the "removal of this torn vocal cord". Plaintiff testi-
fied, however, that her voice had not been helped as to
her "natural tone", and that she still has very much
difficulty in speaking; that she "can't sing at all any
more"; that she cannot speak for any length of time
without "getting weak and just can't talk plain". There
was considerable evidence to the effect that the plaintiff
had a natural well-toned voice prior to the bronchoscopic
examination, but that her voice was very hoarse and
that she could not sing after the examination.

Dr. Leo A. Asher, Jr., one of the interns, testified to the
effect that he took the history of the plaintiff upon her
admission to St. Mary's Hospital; that he was present
part of the time while Dr. Moore was performing the
bronchoscopic examination; that during the examination
he was sent by Dr. Moore for an instrument, but that he
does not remember the kind of instrument; that it was
about fifteen or twenty minutes from the time he left
the operating room until he was back with the instru-
ment; that he does not know whether Dr. Moore, in
making the examination, used the instrument which he
brought; that he had never witnessed a complete bron-
choscopy and that upon the suggestion of Dr. Moore he
took a look through the instrument into plaintiff's throat
"for an actual vizualization of her bronchial tree", and
that Dr. Moore let the other intern and the nurse present
at the time of the examination also "look for a second"
through the bronchoscope. The other intern and the nurse
present at the examination did not testify.

Dr. Richard Stevens, the first physician consulted by
plaintiff about her throat condition, was not present at
the time of the bronchoscopic examination but testified

to the effect that he arranged for plaintiff's admission to St. Mary's Hospital; that he conferred with Dr. Moore after the examination and that Dr. Moore reported that plaintiff was suffering from "a dilated vein just below the vocal cords in the throat"; that her voice was "all right" prior to the examination but that she was hoarse, "not a severe hoarseness", several weeks after the examination; that Dr. Moore treated her thereafter periodically up until the time of his death; that Dr. Moore's specialty was "the ear, nose and throat", and that he thought Dr. Moore "was capable of carrying out a bronchoscopic examination to find out the cause of this hemorrhage".

Sister Mary Carola testified to the effect that she was in charge of the administration of St. Mary's Hospital; that Dr. Moore was on the senior surgical staff of the hospital, was an outstanding specialist of the ear, nose and throat, and that he performed bronchoscopic examinations; that the hospital furnished examining rooms for such examinations and also furnished "assistants in the form of residents or interns and nurses" and that it was not the usual practice of the hospital to furnish specialists with necessary instruments for examinations; that the hospital was not equipped with "full facilities" in the way of instruments for the examination performed upon plaintiff by Dr. Moore; and that interns and nurses assisting specialists are under the direction of the specialist. This witness was not present at any time during the examination given by Dr. Moore.

Evidence of other witnesses of plaintiff related only to the condition of her voice before and after the bronchoscopic examination. The defendant offered no witness except Thomas W. Moore, the defendant and personal representative of the estate of Dr. Joseph Hallock Moore. This witness, also a physician and the father of Dr. Joseph Hallock Moore, had no personal knowledge as to any facts connected with the bronchoscopic examination. He testified as to certain original entries in the account books of

Dr. Joseph Hallock Moore, from which it appeared that no charge had been made on the books for the services rendered to the plaintiff by Dr. Joseph Hallock Moore subsequent to the bronchoscopic examination.

Plaintiff contends that these facts establish negligence and lack of professional skill on the part of Dr. Joseph Hallock Moore, particularly in his failure to have provided a necessary instrument before commencing the examination, necessitating a delay in obtaining the instrument from his office, and in further delaying the operation by permitting the two interns and the nurse to look through the bronchoscope, and that these delays resulted in the examination being unduly prolonged. She further contends that the negligence and lack of professional skill is clearly evidenced by the fact that Dr. Joseph Hallock Moore made no charge for services rendered by him to plaintiff between December 10, 1946, and April 24, 1947.

We are of the opinion that the evidence falls far short of showing any negligence or lack of professional skill on the part of Dr. Joseph Hallock Moore, or that any of the acts alleged to have constituted negligence, or failure to use professional skill, contributed to the injury of plaintiff. True, there may have been some delay in the completion of the examination, but nowhere in the evidence is there any proof, or any intimation, that the examination was unduly prolonged, or that the injury was the result of such delay. The record does not disclose that Dr. Moore did not proceed in the usual manner with the examination during the fifteen or twenty minutes time that Dr. Asher was absent for the purpose of bringing an instrument; what that instrument was; or whether that instrument was thereafter used in the examination. In so far as the record shows, the instrument may have been desired by Dr. Moore for use in some emergency that did not arise. The delay resulting from permitting the two interns and the nurse to look through the bronchoscope was of very short duration and no negligence or lack of skill can be presumed therefrom. No injury re-

sulting therefrom is shown. The failure of the account books of Dr. Joseph Hallock Moore to show any charge for the services rendered plaintiff between December 10, 1946, and April 24, 1947, could have been the result of so many things other than evidence of negligence or lack of professional skill that we think it needs no further comment.

The evidence shows that Dr. Joseph Hallock Moore was a specialist in the examination and treatment of the throat, including the art of making bronchoscopic examinations. There is no showing, or attempt to show, that the method of examination of plaintiff made by him was not such as was usually employed by other like specialists in his community. Regardless of the skill used in the making of such an examination "accidents will sometimes occur", as testified to by Dr. Howard, and sometimes it is necessary, in order to save the life of the patient, to "sacrifice or cause trauma", as also testified to by Dr. Howard. Negligence, or lack of skill, in such cases, to create liability, must be proved, not presumed. In *Dye* v. *Corbin*, 59 W. Va. 266, 53 S. E. 147, this Court held in Points 2 and 3, Syllabus:

> "In an action for damages against a physician, for negligence and want of skill in the treatment of an injury or disease, the burden is on the plaintiff to prove such negligence or want of skill, resulting in injury to the plaintiff."

> "A physician is not required to exercise the highest degree of skill and diligence possible, in the treatment of an injury or disease, unless he has by special contract agreed to do so. In the absence of such special contract, he is only required to exercise such reasonable and ordinary skill and diligence as are ordinarily exercised by the average of the members of the profession in good standing, in similar localities and in the same general line of practice, regard being had to the state of medical science at the time."

See also *Maxwell* v. *Howell*, 114 W. Va. 771, 174 S. E. 553; *Vaughan* v. *Memorial Hospital*, 100 W. Va. 290, 130 S. E. 481.

814

Plaintiff further contends that these alleged acts of negligence, or acts alleged to show failure to use professional skill, coupled with the showing that the plaintiff's voice was normal before the examination but that after the examination she was hoarse, and that the "left vocal cord, posterior half, seems to have been separated from the remaining part of the cord", make a case of prima facie liability under the holding in *Buskirk* v. *Bucklew*, 115 W. Va. 424, 176 S. E. 603, and *Howell* v. *Biggart*, 108 W. Va. 560, 152 S. E. 323, that "* * * cases may arise where there is such a want of skill as to dispense with expert testimony". We are of the opinion that the rule has no application to the instant case. It is clearly shown that a bronchoscopic examination is a "delicate procedure" requiring "a highly specialized surgeon to perform one of these examinations with best results * * *". This being true, only one possessed of special learning and knowledge of such skill would be able to say whether the examination was made in the proper or recognized manner and whether proper skill was used. The authorities relied upon by plaintiff recognize the general rule to be "that want of professional skill can be proved only by expert witnesses". See *Dye* v. *Corbin, supra; Maxwell* v. *Howell, supra; Vaughan* v. *Memorial Hospital, supra.*

The judgment of the Circuit Court of Cabell County is reversed, the verdict of the jury set aside, and a new trial awarded the defendant.

*Judgment reversed;*
*verdict set aside;*
*new trial awarded.*