DOROTHY JEANNE SCHROEDER

*v.*

LONNIE WALTER ADKINS, JR.

(No. 12319)

Submitted January 19, 1965.     Decided April 13, 1965.

*Huddleston & Bolen, William C. Beatty,* for appellant.

*Greene, Morgan & Ketchum,* for appellee.

HAYMOND, JUDGE:

In this malpractice action, instituted in the Circuit Court of Cabell County, West Virginia, on March 16, 1962, the

plaintiff, Dorothy Jeanne Schroeder, a single woman about forty years of age when the case was tried, seeks a recovery of damages from the defendant, Lonnie Walter Adkins, Jr., a duly licensed chiropodist, for injuries caused by the alleged negligence of the defendant in treating her feet for the purpose of removing certain elevations or bumps from each of her little toes.

Upon the trial of the case in October 1962 the defendant moved the court at the conclusion of the evidence in behalf of the plaintiff and again at the conclusion of all the evidence to strike the evidence offered by the plaintiff and to direct a verdict for the defendant. Each motion was overruled and, the case having been submitted to the jury, the jury returned a verdict for the plaintiff in the amount of $10,000.00. On October 15, 1962 the circuit court rendered judgment for the amount of the verdict, with interest and costs, and by order entered May 13, 1963 refused to grant the motion of the defendant to set aside the foregoing judgment and enter judgment for the defendant notwithstanding the verdict. From that judgment this Court granted this appeal on the application of the defendant.

On May 16, 1961, the plaintiff, being unable to obtain an appointment with a chiropodist who had regularly treated her for a considerable period at intervals of approximately six to eight months for the removal of callous from the bottom of her feet, at the suggestion of a local lawyer friend, made an appointment and went to the office of the defendant for the purpose of having callous removed from her feet.

While the defendant was engaged in removing the callous and while the plaintiff was looking at her bare feet she told the defendant that she wished she did not have two little bumps on the side of each little toe. At that time, according to her testimony, though she had the bumps on the top of each little toe, which she said were like a small piece of gristle, the bumps had never been treated and had never caused her any trouble, or pain or suffering, and she had never had any corns on her feet and had never been treated for corns or any condition of her feet except the

periodic paring treatment in the removal of callous from the soles of her feet.

The plaintiff testified that when she told the defendant that she wished she did not have the bumps on each foot he asked her to let him remove them and told her that he removed such bumps as often as fifteen or twenty five times each week; that if she did not have the bumps removed she would likely begin to have corns; that she then asked him if the removal would harm her in any way and he replied that it was so insignificant that it could not hurt her at all and that she would be all right. She also testified that he showed her a book which contained a picture and explained the operation for the removal of the bumps. She became interested in the suggested treatment and spoke to her regular chiropodist about it and talked to the defendant again about it a day or two before July 19, 1961, at which time she again came to his office, discussed the matter with him, and made an appointment for July 26, 1961. At that time he treated her in the operating room of his office.

Her version was that he washed her feet, put red medicine on them, inserted a needle which benumbed each toe, and then performed surgery on the little toe on the left foot during which he cut across the toe in two places and removed a small substance which he told her was a tendon. When he began to operate on the little toe on the right foot she told him she was fainting and he then said that he would not finish the surgery at that time but would do so later. He placed a bandage on the left foot which prevented her from wearing her regular shoe.

She stated that he did not tell her that she should not take part in her usual television program; and she went to the studio that evening for that purpose. When she returned to her home after the operation which was started about ten o'clock that morning, she was weak and fainted and she experienced constant soreness, pain and a burning sensation. He visited her at her home several times and removed stitches and changed the bandages. He informed

her that she was doing well and she had no idea that anything was wrong.

She returned to his office on August 16, 1961, at which time he operated on the little toe on her right foot in the same way he had operated on the little toe on her left foot. After these operations she discovered that her toes dropped so that she felt that she was walking on her toe nail. He called at her home two or three times after the second operation. When she complained about the pain she experienced and the dropping of her toe he told her that the condition would disappear if she massaged and washed her left foot in hot water. This she did but the condition did not disappear. She wished him to complete his treatment and to operate again if necessary to improve her condition and she called his home on Sunday before Labor Day for an appointment. His wife answered the telephone call and told the plaintiff that the defendant was away. Later the same day she called again and talked to defendant's wife, who told the plaintiff that the defendant told her to tell the plaintiff that he could not see her until Friday of that week. After that the plaintiff made no further calls and did not see or consult the defendant and he did not call her again. She then consulted another chiropodist who treated her for a short time and bandaged her feet.

Being unable to wear her shoe and experiencing pain, she consulted her family physician and also a local orthopedic surgeon who recommended surgery. She then called upon a doctor in Cincinnati during the first or second week in September 1961 who recommended a specialist, an orthopedic surgeon, Dr. Schweitzer, who on September 22 examined her toes, both of which had dropped, and recommended surgery, and on November 2, 1961, he performed a major surgical operation on both little toes at a hospital in that city. In the operation which he performed he removed in its entirety the bone nearest the foot in each of her little toes. She was required to remain in the hospital four days and as a result of this surgery her little toes are straight but shortened and she has less than full

tendon control of her little toes and this condition is permanent. The purpose in performing the operation was to relieve the pain and discomfort of the plaintiff and to enable her to wear ordinary shoes and to walk comfortably and apparently this result has been accomplished.

Dr. Schweitzer whose testimony was admitted in the form of a deposition stated in response to an objectionable hypothetical question based on the history given him by the plaintiff that she had no trouble with her little toes, or no discomfort, or injury or pain or infection, but which contained no reference to the bumps on her toes, that the operation performed by the defendant was the proximate cause of the condition of her feet when the witness operated on her on November 2, 1961. He also stated that the plaintiff had a hammertoe deformity on each of her little toes, which he characterized as practically synonymous with contractures of those toes, when she came to him for treatment.

The parents of the plaintiff, with whom she makes her home, testified that before she was treated by the defendant her feet were normal and caused her no trouble or pain and that she did not have corns on her toes but that she did have little bumps on the top of her little toes and that there were no defects in her feet; that her little toes did not turn under; and that she had no difficulty in putting on her shoe or in walking until after the defendant operated on her little toes. Two of her friends testified to the same effect.

A local chiropodist, a witness in behalf of the plaintiff, examined her in December 1961, after the operations had been performed by the defendant and by Dr. Schweitzer. He treated her after December 1961 and took x-ray photographs of her feet at that time and in February 1962. He found that she had a flail toe which was freely movable but could not be completely controlled. He testified that in his opinion if a patient had no trouble with her toes or no pain, or discomfort, or infection or injury but had a hammertoe, a chiropodist would not operate unless he

would do so for cosmetic reasons. He was then asked this hypothetical question: "Doctor, you have stated that you are acquainted with the ordinary skill and diligence of the average chiropodist in this community. Now, Doctor, assume that Dorothy Jeanne Schroeder went to Dr. Adkins' office to have Dr. Adkins remove a callous from the bottom of her feet; that she asked him about a small knot on each little toe; and assume that Dr. Adkins told her that he could remove them, and that it was a simple operation, that he did many of them each week; and she later went to him and again for the purpose of removing these small knots on each little toe, and assuming further, Doctor, that without explaining to Dorothy Jeanne Schroeder that he was going to operate on her little toes to correct a hammer-toe and without telling her she had hammer-toes he did operate on her. Now, Doctor, assuming all the facts to be true, can you say with reasonable medical certainty that Dr. Adkins did not use ordinary skill and diligence of the average chiropodist in this community?" To that question he gave these answers: "No—* * *. Why, I would have to say no to that. But I—usually I mean, before you do surgery you explain to the patient what you are going to do. I mean, if you would do that then the only answer to that question would be no. But I assume that—I assume that Dr. Adkins probably went over surgery with her." On cross-examination he testified that before he could determine whether he would operate to remove bumps from the little toes of a patient he would have to see the patient.

The defendant testified that the plaintiff was informed about the operative procedure, that she considered the procedure and about two months after it had been explained to her she made another appointment in connection with the operation to be performed; that he did not tell her that he performed twenty or twenty five such operations each week; that the plaintiff told him that she had consulted the chiropodist who regularly treated her and that he had told her that if the surgery was performed tendons would be severed and that the defendant was capable and able to perform the surgical procedure.

The defendant also stated that when the plaintiff came to him for the removal of callous from the bottom of her feet she had a hard corn on each little toe and that beneath each corn was an adventitious bursa which is a sac containing fluid and is accompanied by pain; that the bumps on the plaintiff's little toes contained the corns and the bursa; that her little toes disclosed contractures which the witness said were synonymous with hammertoes; and that her feet because of those conditions were not normal; that he did not tell her that the operation would accomplish a cure; that when she wanted to know how long she would have to refrain from wearing high heeled shoes he told her she would have to use an accommodation shoe for a period of four weeks to six weeks; that he removed some tissue on the bursa and severed tendons to correct the hammertoe; that his treatment was conservative; that the plaintiff walked from the defendant's office after the operation on the left toe on July 26; that she complained of no pain and experienced only the discomfort attendant upon the operation; that he cut the tendon on the right little toe on July 26 but did not perform any other surgery on that toe until August 16, 1961, when he operated on it in the same manner as he had operated on the left little toe on July 26; that during the time he treated the plaintiff she visited his office seven times, including the surgical procedure, and he made six house calls; that he last saw the plaintiff professionally on August 30, 1961; and that though he had provided an appointment for her on September 8, 1961, she did not keep that appointment.

Although Dr. Schweitzer testified that he removed the entire proximal phalanx, that is the bone in the section of the little toe nearest the foot, from the plaintiff's little toes, the defendant and two other chiropodists testified that no chiropodist in the Huntington area would remove that bone to correct a hammertoe because the removal of that bone would cause the toe to drop or flail and produce the condition which the plaintiff asserts resulted from the operations performed by the defendant.

Two chiropodists, practicing in Huntington, testified as witnesses in behalf of the defendant, that the surgical procedure employed by the defendant in his treatment of the plaintiff was proper and good surgical procedure and was attended by the ordinary skill and diligence ordinarily exercised by the average practitioner of chiropody in good standing in Huntington, regard being had to the state of the science of chirpody at the time he operated on the plaintiff. It was also agreed between the attorneys representing the respective parties that a third chiropodist practicing in Huntington would give the same testimony as the other two chiopodists with respect to the surgical procedure used by the defendant in his treatment of the plaintiff.

The defendant assigns as error to reverse the judgment the action of the circuit court (1) in denying the motions of the defendant for a directed verdict for the defendant on the ground that the plaintiff has failed to establish actionable negligence on the part of the defendant; (2) in permitting the jury to award damages for alleged breach of contract even though this action is not based upon any contract between the plaintiff and the defendant; (3) in refusing to recognize the defense that the plaintiff was guilty of contributory negligence; (4) in giving plaintiff's Instruction No. 2, as amended, and Instructions Nos. 3 and 4, offered by the plaintiff; (5) in refusing to give Instructions Nos. 1, 6, 7, 9, 10, 11, 12 and 13, offered by the defendant; (6) in admitting certain evidence offered by the plaintiff and objected to by the defendant; (7) in overruling the objection of the defendant to certain remarks of counsel for the plaintiff in his oral argument to the jury; and (8) in confirming the verdict which the defendant contends is excessive.

The controlling question for decision is whether the plaintiff has established negligence upon the part of the defendant in his treatment of the plaintiff which was the proximate cause of the injuries of which she complains.

The principle is well settled by decisions of this Court that in an action for damages against a physician or other

medical practitioner for negligence and want of skill in the treatment of an injury or disease, the burden is on the plaintiff to prove such negligence or want of skill, resulting in injury to the plaintiff; that a physician or other medical practitioner is not required to exercise the highest degree of skill and diligence possible, in the treatment of an injury or disease, unless he has by special contract agreed to do so; and that in the absence of such special contract, he is required to exercise only such reasonable and ordinary skill and diligence as are ordinarily exercised by the average of the members of the profession in good standing, in similar localities and in the same general line of practice, regard being had to the state of medical science at the time. *White* v. *Moore,* 134 W. Va. 806, 62 S. E. 2d 122; *Maxwell* v. *Howell,* 114 W. Va. 771, 174 S. E. 553; *Vaughan* v. *Memorial Hospital,* 103 W. Va. 156, 136 S. E. 837; *Meadows* v. *McCullough,* 101 W. Va. 103, 132 S. E. 194; *Vaughan* v. *Memorial Hospital,* 100 W. Va. 290, 130 S. E. 481; *Browning* v. *Hoffman,* 86 W. Va. 468, 103 S. E. 484; *Dye* v. *Corbin,* 59 W. Va. 266, 53 S. E. 147; *Lawson* v. *Conaway,* 37 W. Va. 159, 16 S. E. 564, 18 L.R.A. 627, 38 Am. St. Rep. 17; *Kuhn* v. *Brownfield,* 34 W. Va. 252, 12 S. E. 519, 11 L.R.A. 700.

In the leading case of *Dye* v. *Corbin,* 59 W. Va. 266, 53 S. E. 147, this Court enunciated, among others, these points in the syllabus:

"2. In an action for damages against a physician, for negligence and want of skill in the treatment of an injury or disease, the burden is on the plaintiff to prove such negligence or want of skill, resulting in injury to the plaintiff.

"3. A physician is not required to exercise the highest degree of skill and diligence possible, in the treatment of an injury or disease, unless he has by special contract agreed to do so. In the absence of such special contract, he is only required to exercise such reasonable and ordinary skill and diligence as are ordinarily exercised by the average of the members of the profession in good standing, in similar localities and in the same general line of practice,

regard being had to the state of medical science at the time.

"4. A physician does not warrant or insure that his treatment will be successful, in the absence of special contract to that effect.

"5. Failure on the part of a physician to effect a cure does not, alone, establish, or raise a presumption of, want of skill, or negligence, on his part."

Though a chiropodist is not a physician or surgeon and though chiropody has been characterized as "a practice ancillary—a hand maiden—to medical practice in a limited field considered not important enough for a doctor of medicine to attend" which satisfies a gap in medical care which the medical profession has failed to fill, the principles stated in the above quoted syllabus points apply to a chiropodist in the practice of his profession which encompasses "the medical, mechanical or surgical treatment of the ailments of the human hand or foot, except the amputation of the foot, hand, toes or fingers, without the use of anaesthetics other than local. It shall also include the fitting or recommending of appliances, devises or shoes for the correction or relief of minor foot ailments." *Medical Care, Inc.* v. *Chiropody Association of West Virginia,* 141 W. Va. 741, 93 S. E. 2d 38.

The general rule is also well established that in medical malpractice cases negligence or want of professional skill can be proved only by expert witnesses. *Roberts* v. *Gale,* 149 W. Va. 166, 139 S. E. 2d 272; *White* v. *Moore,* 134 W. Va. 806, 62 S. E. 2d 122; *Maxwell* v. *Howell,* 114 W. Va. 771, 174 S. E. 553; *Vaughan* v. *Memorial Hospital,* 100 W. Va. 290, 130 S. E. 481; *Dye* v. *Corbin,* 59 W. Va. 266, 53 S. E. 147. In the *Roberts* case this Court held in point 2 of the syllabus that, as a general rule, in medical malpractice cases, negligence or want of professional skill can be proved only by expert witnesses.

In the case at bar there is no expert testimony to prove that the defendant, in the treatment which he administered to the plaintiff, was negligent or did not possess or exercise

ordinary professional skill or diligence. On the contrary all the expert testimony given by the Huntington chiropodists who testified as witnesses in behalf of the defendant was that the surgical procedure used by the defendant was proper or good practice and that he exercised ordinary skill and diligence in accordance with recognized and approved methods in the community in which he practiced as a competent chiropodist.

The local chiropodist who testified as a witness in behalf of the plaintiff, in response to a hypothetical question relating to the procedure employed by the defendant in his treatment of the plaintiff, stated that he could not say that such procedure was not proper. Dr. Schweitzer, in answer to a hypothetical question stated that the condition of the plaintiff's feet at the time he examined them after the defendant had ceased to treat her, resulted from the treatment administered by the defendant. He did not express any opinion as to whether the treatment administered by the defendant was negligent or proper or was in accordance with recognized and approved methods in the Huntington community. The testimony of the parents and the friends of the plaintiff, who testified as nonexpert witnesses, was not sufficient to establish negligence of the defendant in his treatment of the plaintiff.

The evidence is manifestly insufficient to satisfy the requirement that the plaintiff, to recover in a medical malpractice case, must prove negligence of the practitioner administering medical treatment which resulted in the injury to the plaintiff. For that reason the circuit court should have sustained the motion of the defendant, at the conclusion of the evidence, to direct a verdict in his favor and, having refused to grant such motion, should have given Instruction No. 1, offered by the defendant, which would have directed the jury to return a verdict for the defendant. The refusal of the circuit court to grant such motion and to give such instruction constituted reversible error and requires reversal of the judgment rendered by the circuit court.

The ruling upon the controlling question upon this appeal, as already indicated, requires reversal of the judgment and a remand of the case to the circuit court. Inasmuch, however, as there may be a retrial of the case in the circuit court, it is appropriate that the other pertinent assignments of error should be considered upon this appeal, in order that upon a retrial of the case the circuit court will have the benefit of the rulings of this Court upon those questions.

It was error to permit the hypothetical question propounded to Dr. Schweitzer which related to the question whether the condition of the plaintiff's feet at the time they were examined by Dr. Schweitzer was caused by the treatment administered by the defendant. The hypothetical question was incomplete and was also based upon assumed facts which were unsupported by the evidence and for that reason should not have been submitted to Dr. Schweitzer as an expert witness. *Blair* v. *Clark Coal and Coke Company,* 107 W. Va. 507, 148 S. E. 849; *State* v. *Painter,* 135 W. Va. 106, 63 S. E. 2d 86; *Cline* v. *Evans,* 127 W. Va. 113, 31 S. E. 2d 681; *Williams* v. *State Compensation Commissioner,* 127 W. Va. 78, 31 S. E. 2d 546; *State* v. *Taylor,* 105 W. Va. 298, 142 S. E. 254. In *Blair* v. *Clark Coal and Coke Company,* 107 W. Va. 507, 148 S. E. 849, this Court held in the syllabus that "A hypothetical question which assumes facts unsupported by the evidence should not be submitted to an expert witness."

Careful consideration has been given to the action of the circuit court in giving instructions requested by the plaintiff and in refusing to give certain instructions requested by the defendant and the other questions relating to the admissibility of evidence. Though the instructions offered by the plaintiff and given by the court were rather ineptly phrased they state substantially correct principles of law and the action of the circuit court in giving them did not constitute reversible error. Other than Instruction No. 1 previously referred to, the instructions offered by the defendant and refused by the court, some of which relate to the contentions of the defendant that the plaintiff was

guilty of contributory negligence and that the plaintiff's claim was erroneously based on contract, instead of tort, which were rejected by the circuit court by its refusal to give such instructions, were properly refused by the court. The action of the court with respect to the admissibility of evidence, of which the defendant complains, likewise did not constitute reversible error. Though the remarks of counsel for the plaintiff, to which counsel for the defendant objected, should have been excluded by the court, the refusal of the court to exclude such remarks, though erroneous, did not constitute reversible error; and the question whether the verdict is excessive is not considered or determined on this appeal.

For the reasons stated the judgment of the circuit court is reversed, the verdict of the jury is set aside, and this case is remanded to the circuit court for a new trial which is here awarded the defendant.

*Judgment reversed,*
*verdict set aside,*
*case remanded.*