Johnna RUBIN, Administratrix of the Estate of Jerry Rubin, deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. CIV.A.3:970560.

United States District Court, S.D. West Virginia, At Huntington.

Sept. 27, 1999.

Henry E. Wood, III, Wood & Associates, L.C., Charleston, WV, Johnna Rubin, Elkview, WV, for Plaintiff.

Stephen M. Horn, Assistant U.S. Attorney, Charleston, WV, Ray L. Hampton, II, Special Assistant U.S. Attorney, Huntington, WV, for Defendant.

## MEMORANDUM OPINION

STAKER, Senior District Judge.

This action was commenced in this court on May 30, 1997, against the defendant United States of America by the plaintiff Administratrix. The plaintiff seeks to recover damages for the death on March 29, 1994, of her decedent, which her complaint alleges resulted from the negligent and improper medical care and treatment furnished to him as an outpatient by government employees acting in the course of their employment at the Veterans Administration Area Medical Center, near Huntington, West Virginia (hereinafter the "VA Medical Center"), in this district.

### Jurisdiction

The action was instituted pursuant to 28 U.S.C. §§ 1346(b)(1) and 2675(a) and West Virginia Code, § 55–7–5 through –7.

Title 28 U.S.C. § 1346(b)(1) confers on district courts exclusive jurisdiction of civil actions against the United States for claims of death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

The provisions of West Virginia Code § 55–7–5, germaine here, provide, in substance, that when the death of a person shall be caused by a wrongful act, neglect or default, and the act, neglect or default is such as would have entitled the party injured, if death had not ensued, to maintain an action to recover damages in respect thereof, then the person who would have been liable, if death had not ensued, shall be liable in an action for damages. West Virginia Code § 55–7–6 provides that every action for wrongful death shall be brought by and in the name of the personal representative, who has been duly appointed in this state, of such deceased person.

Title 28 U.S.C. § 2675(a) requires, as a prerequisite to the institution of an action pursuant to 28 U.S.C. § 1346(b)(1), such as this one, that the claimant first present the claim to the appropriate federal agency, here the Veterans Administration, and that his claim shall have been finally denied by that agency in writing, which has been sent to the claimant by certified or registered mail.

The plaintiff was duly appointed the Administratrix of the decedent's estate by the County Commission of Kanawha County, West Virginia on April 28, 1994; on March 12, 1996, the Government received from the plaintiff an administrative tort claim based on the decedent's death; and that claim was denied by the Government on December 3, 1996. Documents establishing these facts were stipulated by the parties as being authentic, were introduced into evidence and are respectively marked as Joint Exhibits 1, 2 and 7.

Based upon the foregoing, the court finds and holds that it has jurisdiction of this action.

### Plaintiff's Complaint

Plaintiff's complaint alleges, and the defendant admits, that the decedent died on or about March 29, 1994,[1] after having

---

1. In its answer to the complaint, the defendant admits that the decedent died on March 29, 1995, which the court is confident was a typographical error, the true date of his death being March 29, 1994.

been an outpatient at the VA Medical Center from about December, 1989, to the date of his death and that the Government employees who provided medical care to the decedent there were acting within the scope and course of their employment.

The complaint further alleges, but the Government denies, that those government employees caused the decedent's death by failing to exercise acceptable and approved standards of medical care in providing care and treatment to him while he was being treated there. More specifically, the plaintiff charges, and the defendant denies, that those employees breached acceptable standards of care by refilling his pain medications, which included morphine, earlier than was advised and by administering injections of narcotic medication whenever decedent requested it even though such injections were given earlier than was prescribed, notwithstanding that they knew that the decedent was abusing the protocol medicines prescribed for him. His abuse is alleged to consist of his not administering to himself the prescribed medications in the manner in which they were prescribed to be used. The Government employees also are alleged to have violated the standard of care because they failed to direct appropriate follow-up and monitoring and psychiatric or other counseling of the decedent and even increased the morphine solution medicines and refilled the protocol medicines, the last time being March 21, 1994, in spite of the decedent's known abuse of his medications and in spite of the decedent's worsening medical condition.

The court finds and holds that the plaintiff failed to prove those charges by a preponderance of the evidence and holds and rules against the plaintiff and in favor of the Government in this action.

**The Evidence**

The evidence presented to the court bearing upon the liability issues consisted of the following:

(1) The testimony given at the trial to the court by (a) Thomas Poskitt, M.D., the decedent's attending physician during his treatment for his intractable pain at the V.A. Medical Center; (b) Doug Boren, Dr. Poskitt's physicians' assistant, who was involved in decedent's treatment of that pain; (c) John Skaggs, pharmaceutical supervisor at the VA Medical Center; and (d)various members of the decedent's family;

(2) The deposition testimony of (a) Howard A. Heit, M.D., plaintiff's expert witness (Joint Exhibit 5); and (b) Josiah K. Lilly, M.D., defendant's expert witness (Joint Exhibit 6);

(3) Documentary evidence consisting of (a) the postmortem examination report pertaining to the decedent's death, dated March 29, 1999, issued by Irvin M. Sopher, M.D., Chief Medical Examiner of the State of West Virginia (Joint Exhibit 3); (b) a computer printout from the VA Medical Center's pharmacy listing the medications prescribed for the decedent's use while he was treated there (Joint Exhibit 4); (c) the medical records documenting the decedent's treatment at the VA Medical Center during the time he was treated there (Joint Exhibit 9) [2]; (d) the medical records concerning treatment of the decedent by C.Y. Amores, M.D., of Charleston, West Virginia, a neurosurgeon, who was not employed by the Government and who was decedent's attending physician before Dr. Thomas R. Poskitt commenced treatment at the VA Medical Center on or about March 9, 1990 (Joint Exhibit 10); (e) the West Virginia Board of Medicine's Position Statement on the Use of Opioids for the Treatment of Chronic, non-malignant Pain,

---

**2.** Almost all handwritten portions of the VA Medical Records (Joint Exhibit 9) were written in such atrocious cacography that the court was hardly able, if at all, to read them. They were also interspersed with arcane symbols, making their interpretation doubly difficult. Where they are summarized herein, the court feels they are interpreted with reasonable accuracy.

dated July 14, 1997 (Defendant's Exhibit 3); (f) pages 6 through 8 of the *Clinical Journal of Pain* (1977) entitled "The Use of Opioids for the Treatment of Chronic Pain—A consensus Statement from the Academy of Pain Medicine and the American Pain Society" (Defendant's Exhibit 4); (g) pages 203 through 217 of the *Journal of Pain and Symptom Management*, Vol. 4, No. 4, April 1996, entitled "Opioid Therapy for Chronic Nonmalignant Pain: A Review of the Critical Issues" (Defendant's Exhibit 5); and (h) an excerpt consisting of Section 12, pages 914 to 944, of *Principles of Addiction Medicine*, published in 1998 by the American Society of Addiction Medicine (Defendant's Exhibit 6).

None of the contents of the documentary evidence listed above was disputed by the parties except that in his deposition, at page 39, line 7, Dr. Heit, plaintiff's expert witness, asserted that the VA Medical Center's records disclosed that decedent was prescribed and furnished 460 opioid pills on November 24, 1993, which assertion Dr. Poskitt denied in his testimony,[3] and, of course, the defendant takes issue with the validity of Chief Medical Examiner Dr. Sopher's opinion, set forth on page 2 of Joint Exhibit 6, that the decedent's death "is considered due to probable morphine intoxication."

### Summary of the Testimony

*Jerry Nicole Litton*, decedent's daughter, who was 16 years old at the time of his death, testified that she, her brother and father lived together for about three years prior to the decedent's death. She stated that in the later part of 1993 and on into 1994 the decedent would sometimes take five or six pills and at the same time drink the liquid morphine out of the bottle and would get "loony," call her by her sister's name, give unresponsive answers to questions and would pass out and drop a cigarette which would burn his skin. She also testified that during his last six months the decedent's house was very dirty, his bedclothes were dirty from where he spilled food and his medicine and tools, cats, dogs were in his bed with him. She stated that no one monitored when he took his medicine or how much he took.

*Johnna Rubin*, the plaintiff, testified that she was the decedent's wife although she had filed for divorce in August 1991. As the court recalls her testimony, she last saw him on Christmas 1993 at which time his bed and clothes and the house were filthy and trash and dirty dishes were in the house. She told the decedent at that time that something would have to be done to rectify these conditions.[4]

*Howard A. Heit, M.D.*, plaintiff's expert witness, testified by deposition. He graduated from George Washington Medical Center where he also served as an intern and first year medical resident. He then went to Walter Reed Army Medical Center to complete his second year of medical residency. He became board certified in internal medicine and then had a two-year fellowship in gastroenterology and hepatology after which he was certified in gastroenterology and liver disease. He is licensed to practice in the State of Virginia.

Sometime after 1986 he retrained in addictive medicine with a special interest in chronic pain. In 1992, he was certified by the American Society of Addiction Medicine and last year was named one of its fellows. He is also a fellow of the American Academy of Medicine which deals with

---

**3.** The court carefully examined the medical records from the VA Medical Center, Joint Exhibit 9, as well as Joint Exhibit 4, its pharmacy computer printout listing the drugs that were prescribed for the decedent there, and found no entry in either of them indicating that the decedent was prescribed 460 opioid pills on November 24, 1993, which belies Dr. Heit's assertion to the contrary and corroborates Dr. Poskitt's denial of that assertion.

**4.** Several members of decedent's family testified substantially to the same effect as did Jerry Nicole Litton and Johnna Rubin, many of them tearfully, but none of them testified that any of them took any steps whatever to alleviate the squalid conditions in which the decedent was living as described by them in their testimony.

teaching and publication in the area of addictive medicine. He was co-chairman of the section on pain and addiction for the Second Edition of the *Principles of Addictive Medicine*, which was published in August, 1998, the First Edition thereof having been published in '92, '93 or '94. He also is a member of the American Academy of Pain Management and the American Pain Society which issue position papers in regards to what would be the standard of care in treating patients who have chronic pain and what would be a breach of those standards.

Dr. Heit testified that the appropriate standard of care is divided into a three-step process; the pre-administration, before opioid therapy is commenced; the administering of the therapy; and the monitoring, review and follow up.

Pre-administration involves evaluating the patient to determine whether his mental status is such that he can follow the rules of opioid therapy; explaining to him the risks and benefits of the therapy; procuring his informed consent to the therapy and to permit analyses of his urine to insure he uses only the opioids prescribed; and developing a definite plan and strategy for a strong program for rehabilitation for his psychiatric and social needs, *i.e.*, what is going on in his life in regard to his wife, a divorce, his children, what type of living conditions he is in and whether they are conducive to good pain management and increasing his function.

When the therapy is commenced, the treating physician should document the dosage and the quantity of the medication being prescribed, any changes thereto and the reasons for the changes. Treatment often involves the use of adjunctive medicines in addition to opioid needs to help with nerve pain, sleep, anxiety, depression and constipation.

The third part of the standard of care requires the treating physician to constantly monitor, review and follow up the patient; monitor aberrant behavior to ascertain whether the patient is using the opioids as directed and to assess the side effects of the therapy, *i.e.*, is the patient falling, having burns secondary to falling asleep while smoking, is he in bed so much that he's having decubiti ulcers.

Dr. Heit testified that the record contained no written protocol showing that the decedent understood what was his and what was Dr. Poskitt's responsibilities in connection with his therapy. Furthermore, Dr. Heit also was critical that there were many times the decedent would come in saying he had run out of his medicine or would come in early therefor and also that he was given shots of Demorol, all of which was enforcing decedent's negative behavior.

Dr. Heit referred to Dr. Poskitt as being a "script" (prescription) doctor, meaning one who is not knowledgeable in holistic pain management and whose treatment consists of having the patient come in, pay a fee, get his medicines and leave. He stated that such conduct by a physician does not comport with acceptable pain management and constitutes a breach of the appropriate standard of care espoused by the Association of Addiction Medicine, the American Academy of Pain Medicine, the American Pain Society and the regulations of the State of West Virginia.

He testified that the physicians' assistant, Doug Boren, was doing pain management but had absolutely no training in that field and that Dr. Poskitt had almost no input into the case, as shown by a review of the medical records.

It was Dr. Heit's opinion that when the decedent refused home health care for his decubiti, the bed sores on one of his feet and in the area of his coccyx, a bone located at the base of his spine, Dr. Poskitt should have told the decedent that he had to hospitalized for an intensive therapy for his decubiti ulcer. Dr. Heit also opined that Dr. Poskitt should have gotten the decedent into individual or group therapy to deal with his depression. He asserted that if he were treating a patient whom he desired to undergo inpatient care for the treatment of his decubiti or for psychiatric

or psychological therapy for his depression but who refused he would tell that patient that "he would have to do things his [Dr. Heit's] way or the highway", meaning the patient would either agree to submit to inpatient treatment or else Dr. Heit would discontinue to treat him and he would be required to seek treatment from some other doctor.

And finally, Dr. Heit stated that he had no doubt within a reasonable degree of medical certainty that the doctors at the VA Medical Center fell far below the accepted standard of care in their treatment of the decedent's chronic pain. However, he expressed no opinion as to whether such was the cause of the decedent's death. He instead stated that he was not a toxicologist and that he would defer to the opinion of the toxicologist [referring to Dr. Sopher, Chief Medical Examiner of the State of West Virginia, who issued Joint Exhibit 3] for the answer to that question.

*Doug Boren,* the physicians' assistant whom Dr. Poskitt assigned to give attention to the decedent, testified that he spent two years in college learning to be a physicians' assistant. He stated that he would see the decedent when the decedent appeared for his monthly appointments if he was on duty. If neither he nor Dr. Poskitt were on duty at the VA Medical Center when the decedent came in the decedent would be seen by either Dr. Mávi or Dr. Rajan. At these monthly appointments, Mr. Boren would take the decedent's vital signs, discuss with him how his pain was and other matters bearing upon his condition and report the results of his interviews to Dr. Poskitt. He testified that at no time from March 1990 through March 1994, did the decedent wish to be psychologically examined and he, Boren, did not believe the decedent needed such examinations during that period.

*John Skaggs,* who was the pharmaceutical supervisor of eleven pharmacists at the VA Medical Center with a B.S. Degree in pharmacy, testified that page 81 of the VA Medical Records (Joint Exhibit 9) was a progress note made by a pharmacist warning the decedent of side effects, etc., attending using the medication being dispensed. He also testified that the pharmacy has always warned patients regarding side effects and that the pharmacist who fills a prescription counsels the patient concerning them.

*Thomas Poskitt, M.D.,* the decedent's attending physician, graduated from Tufts University School of Medicine, in Boston, in 1970. Thereafter, he served an internship, residency and fellowship in hematology/oncology at the New England Medical Center. In 1977, he became a staff oncologist/hematologist at the East Orange VA Medical Center in New Jersey and an assistant professor of medicine at the New Jersey Medical School. He became chief of hematology/oncology at the Johnson City, Tennessee VA Medical Center In 1980. Then in 1988 he came to the Huntington VA Medical Center as associate Chief of Staff of Ambulatory Care and is now a staff oncologist there and also a professor at Marshall University School of Medicine in Huntington. He is board certified in internal medicine and in hematology/oncology and has authored many peer reviewed articles in his field. (See Defendant's Exhibit 2).

Dr. Poskitt testified that he became the decedent's treating physician on March 3, 1990, when the decedent was referred to him by Dr. Subbaro, an emergency room physician at the VA Medical Center to whom the decedent had come to have refilled a prescription written by a Dr. Narayan. He remained the decedent's treating physician to the date of his death on March 29, 1994.

Dr. Poskitt stated that the decedent suffered from intractable pain, which is pain for which there is no treatment other than analgesics and is classified in the category of cancer-related pain and non-cancer-related severe, intractable pain; those two terms are used together because the treatment for each of them is the same. He testified that at first he prescribed Percocet and Oxycodone, both opiates, in an

attempt to control the decedent's pain. It was his testimony that a written protocol was prepared at that time and that a written protocol was prepared each time thereafter when he changed the decedent's controlled substance medication. He described the protocol as an agreement between certain patients who are being prescribed controlled substances and their physicians. The protocol determines and depicts the nature of such drugs prescribed, what the diagnosis is for which opiates are being used and who the case manager is. The object of the protocol is to limit the patient's access to controlled medications and to make sure that only one physician prescribes those medicines and that only one pharmacy, namely the VA, dispenses it. He stated that a copy of those protocols was supposed to have been kept in the VA Medical Center pharmacy, another copy in the emergency room and another in Dr. Poskitt's office. (However, the only protocol that appeared in the VA Medical Records was the one dated October 21, 1991. (Joint Exhibit 9, p. 111).)

He testified that he assigned Doug Boren to be the physicians' assistant who would be giving attention to the decedent and Boren served as such until the decedent's death. He explained that physicians' assistants are credentialed to do histories, physicals, order tests, make diagnostic studies, provide, or at least request, consultations and initiate certain types of medications. They function under the aegis of a physician whom they consult when they encounter problems that are above or beyond their expertise. Mr. Boren was a certified physicians' assistant and as such had to be registered and certified every six years and he viewed Boren to be a very competent physicians' assistant and had worked with him with many other patients prior to taking on the decedent's care.

He and Boren met with the decedent the day Boren was assigned. At that time, he gave Boren verbal instructions to enable him, Boren, to assess the risk-versus-benefit analysis of the protocol, *i.e.,* the medications prescribed for the decedent's use. Mr. Boren had the responsibility to ascertain on a monthly basis if the decedent's drug protocol was being adhered to and to determine if it was beneficial and working. Mr. Boren would discuss any change in the protocol with Dr. Poskitt and then would discuss it with the decedent.

Dr. Poskitt testified that only he, and no other person whatsoever at the VA Medical Center, was authorized to write or change prescriptions for controlled substance medications for the decedent and that only the pharmacy at the VA Medical Center was authorized to fill any such prescriptions. No prescription for such controlled substances could be refilled; accordingly, a new prescription for the decedent's controlled substance medications had to be signed by Dr. Poskitt each month when the decedent came in for his scheduled monthly appointments. At those times, Mr. Boren saw the decedent and he discussed the decedent's condition with Dr. Poskitt, often when the decedent, Boren and Dr. Poskitt were all present at the same time. Dr. Poskitt then would write a new prescription for medication to be taken by the decedent during the following month until his next scheduled appointment.[5]

Dr. Poskitt verified that the controlled substance medications and the changes therein, which are referred to in paragraphs numbered 6 through 11 of the Findings of Fact and Summary of the VA Medical Center Records set forth hereinbelow, were respectively prescribed by him monthly during the period he was the decedent's attending physician. Each such prescription had on it directions as to how it was to be taken and used by the decedent.

---

5. The clinic at the VA Medical Center was not open on Saturdays or Sundays for which reason the decedent's monthly visits thereto might vary from between 28 to 30 days but for no longer a period of time.

He stated that if a patient being treated by him with a controlled substance returned for drugs before his regular scheduled appointment for reasons that were not exacerbations of his pain or took medications other than those prescribed or was seeing doctors other than those authorized to write prescriptions for him, it would be cause to suspect that the patient was abusing or hoarding his drugs.[6] However, neither he nor Mr. Boren ever noted any indication or had any suspicion that the decedent was hoarding or abusing his prescription drugs. Furthermore, no member of the decedent's family ever reported to either him or Mr. Boren that the decedent was either hoarding or abusing his, the decedent's, medicines or that anything was amiss involving the decedent or his home life.

Dr. Poskitt related that there were three times in the first year when he was getting the decedent's pain under control that the decedent showed up a week earlier than when his monthly appointment was scheduled because he, the decedent, had increased his dosage to achieve pain control and was out of medicine a week early. (Dr. Poskitt told the court that it is generally expected that patients who have the degree of pain the decedent had are going to have periods of time when their pain will increase because of activity that is unexpected and that they will take more medication at those times. Such patients are instructed that they may at times have to increase their medication transiently to control severe pain, which may cause them to run out of their medicine, but they are told how much additional medicine they may take on those occasions.) The decedent's dose was altered or his medicine actually changed from Percocet to morphine to achieve better control. He did not come in early again until March 9, 1991, when his pain increased again.

In addition, in October 1992 the decedent came to the VA Medical Center after

hours, one week earlier than his scheduled appointment. Neither he nor Mr. Boren were on duty. The decedent was therefore seen by an emergency room physician whom he told that his prescriptions had been stolen. The physician called Dr. Poskitt at home and he prescribed a two-day supply of morphine and told the physician to tell the decedent to come in the next day to see Boren. When he came in the next day, the decedent was told that it was his responsibility to secure his medications to prevent their theft and that he could not again refill them early. He never again reported their theft after that.

With regard to the specifics of his treatment of the decedent, Dr. Poskitt testified, in substance, as follows.

The decedent was given injections of Demorol plus Phenergan five times between March, 1990, and March 29, 1994, because he was having an increase in his pain. The increase in pain may have been induced by the fact that he had to ride from Charleston to Huntington and back for treatment at the VA Medical Center.

Dr. Poskitt stated that morphine is not the type of drug that drug seekers, drug addicts or individuals with addictive disorders look for because it is slowly released into the blood and does not produce a euphoria. Also there is virtually no upper limit to the amount of morphine someone can receive if they are having severe pain. In fact, he has provided doses for some of his patients in the range of 1,000 milligrams of time-released morphine twice a day. Such dosages allowed those patients to function where they could not function before because of pain. Different patients have different thresholds of pain. There is obviously going to be some limit beyond which a physician cannot go in each individual patient; however, according to the textbooks, whereas most drugs have a maximum dose that is permitted, that is not the case with morphine. When it's

---

6. Abusing drugs is not taking them as prescribed. Hoarding them is saving and not taking them as prescribed with the intent to take far more than are prescribed in one dose in the hope of producing a "high."

being used to treat pain in individuals who are adapting to opiates, it is one of the safest drugs that an oncologist can use.

While relief of intractable, severe pain with morphine at the doses the decedent was receiving has side effects, which may include lethargy or periods of inability to converse fluently, however, on the occasions when Dr. Poskitt saw the decedent his appearance looked fairly normal for an obese man sitting in a wheelchair. Neither he nor Mr. Boren ever noted any indication that the decedent was hoarding or abusing his prescription drugs. Patients have to have some amount of medication in reserve so they won't run out in case they can't come in when scheduled because of illness or other emergencies.

He never noted that the decedent was contemplating suicide or suicidal behavior. There are some references [in the record] to possible suicidal behavior, the decedent mentioned once to the staff at the VA that if he didn't get relief he would "check out", but those were at a time when the decedent was in excruciating pain and not getting relief therefrom and before he and Boren ever took over his case.

The decedent had three mental hygiene consults at the VA Medical Center, the last one was in late 1989 or January, 1990. It had been recommended in late 1989 that the decedent have inpatient psychiatric care because of depression but he declined. After he took over the decedent's care on March 9, 1990, and once decedent's pain was relieved, Dr. Poskitt did not see a need for mental hygiene or psychiatry consults.

After social workers reported on their visit to the decedent on November 3 and 12, 1993, he recommended and authorized that a nurse visit the decedent's home five days a week for the one week to attend the decedent's decubiti ulcers; that a home health aide come in three times a week for six months; and that social services be contacted locally. However, the decedent declined all of these services. After the decedent refused all of those treatments and services, he, Dr. Poskitt, had no au-

thority to force the decedent to become an inpatient at the VA Medical Center to be treated for his decubiti ulcers or to undergo psychological or rehabilitative therapy or to force him to receive the home health care.

Dr. Poskitt opined that it would be expected that the decedent's physical condition would deteriorate, given his progressive and constant pain, as evidenced by the fact that he went from a cane to crutches to a wheelchair, indicating that his spinal disease was progressing, his paraplegia was progressing. Furthermore, it is unavoidable that one who can't feel pain and is allowed to smoke in bed will have burns on his body and legs. Decedent was a paraplegic living in his bed, unable to care for himself, with the inevitable consequences of developing bed sores. He, Dr. Poskitt, remarked that he would have been amazed had the decedent not done so.

He asserted that one of the problems in the treatment of non-malignant, intractable pain is that there was no consensus among the different medical specialists as to what guidelines are to be followed by the treating physician but rather many differing opinions as to the proper treatment thereof. For example, neurologists might have theirs, orthopedic surgeons theirs, oncologists theirs and rehabilitation therapists theirs. Based on his experience as an oncologist who had been treating pain since the late 70's and on the literature in his field that he had read, he developed his own set of guidelines: the protocol in the VA Medical Center's records pertaining to the decedent was basically what he devised at the VA.

He agreed that the 11 items on the second page of the West Virginia Board of Medicine's standards, dated July 14, 1997 (Defendant's Exhibit 3), are reasonable, rational, responsible things for a medical practitioner to do in treating a patient like the decedent as of July 14, 1997, or as of 1993 or 1994. He was of the opinion that the treatment and care that he and Mr.

**590**

Boren provided to the decedent substantially complied with all 11 of those items.

He also testified that he agreed with the following statements appearing under the title "Effects of Pain on Addiction Responses," in Section 12 "Pain Management and Addiction," of the *Principles of Addictive Medicine*, Second Edition, (Defendant's Exhibit 6):

> These data parallel the anecdotal experience of many pain clinicians who report that they do not encounter opioid tolerance when providing chronic opioid analgesia to persons with malignant or nonmalignant pain syndromes, and find that doses only need be increased when pathology progresses.

*Id.* at 915;

> Treatment of cancer-related pain in the patient with addictive disease is similar to that in the person without addictive disease. The comfort of the patient should be the primary goal. Opioids never should be withheld when they are needed for effective pain relief because of concerns regarding the development or perpetuation of addiction.

*Id.* at 924; and thirdly, "[i]n addition to the daily dose determined initially, patients should be permitted to escalate dose transiently on days of increased pain...." *Id.* at 927, Table 4, Guideline 8.

It was Dr. Poskitt's opinion that the decedent's treatment conformed with these principles and that the decedent was not an addict.

*Josiah K. Lilly, M.D.*, defendant's expert witness, is licensed to practice medicine in West Virginia, Kentucky and North Carolina, and specializes in anesthesia with a subspecialty in pain management.

He graduated from the West Virginia University Medical School in 1971 and served a surgical internship at the West Virginia University Hospital in Morgantown from 1971 to 1972. After he finished medical school, he attended the Naval Aerospace Medical Institute in Pensacola, Florida, for six months and studied a speciality dealing with aviation medicine and is now a Naval Flight Surgeon and a civilian FAA medical examiner and a civilian medical review officer with the U.S. Department of Transportation. From 1975 to 1977, he served a residency in anesthesiology at Virginia Mason Hospital & Medical Center in Seattle, Washington where he trained under, in his opinion, one of the premier practitioners of pain management in the country who actually helped found the speciality of pain management as well as under another pioneer in that field.

He holds a special certificate in pain management from the American Board of Anesthesia, which must be renewed every ten years, and has recently taken the test for recertification. He also has recently taken the certification test given by the American Board of Pain Management, a relatively new entity, and expects to hear from it shortly.

He is a member of many professional organizations, including the American Society of Anesthesiology, American Society of Regional Anesthesia, and the Medical Group Management Association and American Medical Association.

He was an Assistant Clinical Professor of Anesthesiology at West Virginia University from 1977 to 1980, an Associate Professor from 1980 to 1985, and from 1985 to the present has been a Clinical Professor of Anesthesiology there.

He was the founder of and, from 1981 to 1984, was the Director of the Pain Management Program at the Charleston Area Medical Center, in Charleston, West Virginia,. In 1998, that Medical Center withdrew its support of the program. In the last year of its existence, the Pain Management Program at the Charleston Area Medical Center treated 1, 166 patients. Thereafter, he and others reestablished the pain clinic in Kanawha City, near Charleston, where they have treated patients needing pain therapy and in so doing have used opioid medications, including morphine and morphine elixirs.

He has written and published several peer reviewed articles in his field.

Dr. Lilly testified that he personally saw the decedent, who was then a chronic pain patient of Dr. Amores, four times at the Charleston Area Medical Center pain clinic in 1985 and corresponded with Dr. Amores respecting the decedent.

He stated that prior to July 14, 1997, when the West Virginia Board of Medicine issued its Position Statement on the Use of Opioids for the Treatment of Chronic non-malignant Pain (Defendant's Exhibit 3), which contains the 11 points or standards for treating such pain, there were many guidelines, standards, goals, treatment regimens and so forth for the treatment thereof espoused by different agencies. He pointed to the American Academy of Pain Medicine and the American Pain Society article entitled "The Use of Opioids for the Treatment of Chronic Pain," [copyrighted 1977] (Defendant's Exhibit 4) which states in "Part 1" thereof: "There is *currently* no nationally accepted consensus for the treatment of chronic pain not due to cancer." (Emphasis added). He stated: "I don't think there was any one regulatory agency that has said, 'This is what we think is a good place to start.'" It was his opinion that pain management is a situation where the guidelines and standards are advisory: there are situations where a patient's problems are outside the guidelines but the physicians still have to deal with them.

With regard to the 11 points set forth in the West Virginia Board of Medicine's Position Statement as establishing the standard of care, he pointed out that they were unknown to the physicians in 1993.

Dr. Lilly also testified that it is acceptable to use a physicians' assistant, also called a mid-level provider, someone with a certified training program, in pain management. They are active and used throughout the country. It was his opinion that if a good physicians' assistant is handling a patient who is stable, the supervising physician need personally see the patient only every 3, 4 or 5 months.

With regard to the treatment protocol, Dr. Lilly said that, in addition to a regimen of medication, in a case like the decedent's he would expect to see other points in that protocol such as "if this happens, call me" or "check the bottles every month." It was his opinion that physicians' assistants have to have clear expectations and role definitions and the protocol is supposed to do that for them. He also stated that in 1993 there were a lot of groups that did opioid therapy that didn't even have consent forms much less opioid agreements or contracts that patients signed.

Dr. Lilly disagreed with Dr. Heit's opinion that Dr. Poskitt and the physicians' assistant Boren breached a recognized standard of care. "Dr. Heit is critical of Dr. Poskitt and it's easy to criticize. It's a lot harder to walk in somebody else's moccasins, and I really don't see Dr. Heit walking a mile in anybody's shoes except his own." He stated that in treating intractable pain a physician is taking care of the most unreasonable, irrational and irresponsible people in the world, but the physician "is doing the best he can with what he's got."

On pages 46, line 21, through page 48, line 4, of Dr. Lilly's deposition are the following questions and his answers:

Q Based on your review of the VA medical records and the treatment and care that Mr. Rubin received there, do you have an opinion that you could say to a reasonable degree of medical certainty whether the physicians there, knowing that there was no guidance in West Virginia until July 14, 1997, violated any applicable standard of care that was available, if at all, during the time that they were treating him?

A I can honestly admit to not knowing all the guidelines that every agency and society and regulatory group might have out there that would make recommendations, but as I looked at this, number one, I know the VA system pretty well, and I recognize they have limited resources.

So the use of non-physicians, mid-level providers like a PA is a good thing once

the jobs that those people do are defined and once the expectations are clearly discussed and the person has a chance to find out if they can meet those expectations.

So I think that what he got at the VA is what he couldn't get anyplace else in West Virginia, and that is he got some doctor who had a willingness to maintain opioid access for a guy who was a veteran, had a 100–percent, service-related injury, and that doctor was willing to use a physician extender, a mid-level provider like a physicians' assistant, to help him manage this guy over the course of several years in a fairly austere setting.

I mean, the VA doesn't have tons of money to throw at problems, but they did get consultants, they had home care people to go into the home. I think they did a pretty good job even for now, but certainly for then.

Q When you look·at the Board of Medicine's position statement, on the second page it has a listing of about 11 different criteria that a practitioner should use or consider using in managing a patient with nonmalignant pain?

[Q] Do you have an opinion based on your review of the VA medical records whether even in the time period of 1990 through 1994, the time they were seeing Mr. Rubin, whether the VA physicians substantially complied with these criteria, even though they were not effective until July 14, 1997?

A Well, I think that there were a number of people that were involved in his care. There was a rehab doctor. I think there was a psychologist or psychiatrist, there was Dr. Poskitt, there was the PA. There were a number of people.

I think that each one of those persons brought something to the overall management of his care. Maybe each one of them didn't do all 11, but—let me go down through this here.

I think they did a pretty good job, but I'm not sure that anywhere in the record I ever saw the practice protocol that they talked about. I know that the PA,

Mr. Boren, referred to protocol. So they must have had something that they all understood.

I never saw it, and I don't know for a fact that Mr. Rubin understood all about the protocol, but he certainly knew that there were guidelines and limits and things like.that.

I think for the most part he got just about all this.

Q The opinions that you've given us in the course of this deposition, are they the opinions that you hold to a reasonable degree of medical certainty?

A Yes, sir.

Finally, Dr. Lilly testified that when the decedent refused home nursing and other care, he was end stage; there were no other options for treatment short of taking him from his home and putting him into a skilled nursing facility and saying to him, "Your rights to autonomy and self-determination are forfeited. We're going to take you over."

#### Summary of Dr. Amores's Records

Decedent apparently at some time filed a claim with the West Virginia Workers Compensation Fund because on August 20, 1985, Dr. Amores became his attending physician in connection with his claim and made periodic reports as to his condition to the Compensation Commissioner. Dr. Amores continued to see and treat the decedent as his neurological surgeon in connection with his claim until about June 3, 1992. Joint Exhibit 10, consisting of Dr. Amores' medical records pertaining to the decedent, reflects the progressive worsening of decedent's condition during the time he was under Dr. Amores' care and before he commenced to be treated at the VA Medical Center. Dr. Amores performed an operation on the decedent's spine on September 17, 1985. *Id.* at 375. On January 16, 1987, Dr. Amores noted that decedent had burned his right leg while using a heating pad for pain because he could not feel the burning. *Id.* at 358. A February 23, 1987, notation states that decedent was using a cane when he walked, dragged his

right leg and had diminished feeling in his entire right leg. *Id.* at 357. An Electromyogram Report done on March 17, 1987, notes that there was more significant denervation to his right leg proximally and there had been significant worsening from a prior examination on January 15, 1987. *Id.* at 356. A report of a Cervical MRI performed on the decedent on March 22, 1989, notes that there is a syrinx involving the dorsal cord extending from the lower margin of D/8 inferiorly.[7] *Id.* at 338. Dr. Amores stated on April 17, 1989, that decedent was using two crutches and was having difficulties holding his urine and again notes the syrinx in the lower dorsal spine. *Id.* at 335. And on October 2, 1989, he stated that decedent visited his office on September 5, 1989, after just recently being discharged from the hospital and that he was in a wheelchair with a hyperextension brace. *Id.* at 327. In a February 16, 1990, letter to the VA Medical Center, Dr. Amores stated that decedent had intractable pain, severe at times, and that his reason for writing the letter was so that decedent could obtain his medication through the Veteran's Administration. *Id.* at 322. And in a March 9, 1990, letter to the VA Medical Center, Dr. Amores reported that decedent was basically wheelchair bound and had to stay in bed 80% of the time and that if he does get out of bed he has to stay in the wheelchair. *Id.* at 317.

From the foregoing, it is obvious that during the period from August 20, 1985 to July 7, 1992, while decedent was being treated by Dr. Amores and other physicians and receiving extensive medical testing and care, his general physical condition very appreciably worsened.

### Findings of Fact and Summary of the VA Medical Center Records

The VA Medical Center records, hereinafter referred to as the "VA Records," are contained on pages 1 through 306 of Joint Exhibit 9. The court believes the page numbers thereof indicated below contain entries documenting some of the most salient facts germaine to the issues here and the court hereby finds them as facts.

1. On August 17, 1989, Dr. M. Narayan at the VA Medical Center, in taking what appears to be a comprehensive case history from the decedent, learned from him that he soon thereafter intended to have further surgery on his spine by a surgeon unconnected with the VA Medical Center [neurosurgeon Barth A. Green, M.D., of Miami, Florida (see *id.* at 301–05 for Dr. Green's report) ]. She noted that the decedent would be checking with her in about three months at which time his overall management could be looked into. The signatures of Dr. Poskitt as well as that of Dr. Narayan are affixed thereto. *Id.* at 158–60.

2. Dr. Narayan again saw and examined the decedent on November 16, 1989. She noted that he was much more cheerful and in no acute distress; that he had been seen by her several months ago with regard to his chronic back pain and very briefly the week before [the November 16 meeting] with reference to his complaint of extreme depression and trying to harm himself and that he had been referred to the Mental Hygiene Clinic. The penultimate paragraph of her notes taken then reads: Will recheck the patient in one or two months. Hopefully at the time the patient would have had work up in the Mental Health Clinic and the medication could be changed as needed. *Id.* at 143–46.

3. On November 8, 1989, an Intake Interview of the decedent was conducted by Joyce L. Mullins, M.A., LCSW at the Mental Health Clinic of the VA Medical Center at which time she also took a com-

---

7. A tiny tube runs through the center of one's spinal cord. Fluid can accumulate in that tube and form a sac, called a "syrinx" and also sometimes called a cyst, which exerts pressure on the cord causing intense pain to radiate throughout the body. It can also cause damage to the nerves passing from the cord to different parts, members and organs of the body, which damage is progressive over time.

prehensive history from the decedent. She diagnosed him to be suffering major depression, determined his prognosis to be good and recommended referral of him for an inpatient pain control program and for a total pain program and psychiatric care. *Id.* at 147–50. On page 150, she noted that the decedent attended one year of college at John Grover Community College, studying biology, after he returned from service.

4. Dr. Narayan saw the decedent again on December 11, 1989, and noted that he brought to her his previous medical records, which were reviewed in detail. His history revealed that he had had at least eight major surgeries for the neck and low back and also extensive investigation to substantiate the objective and subjective findings. *Id.* at 143.

5. A record dated March 8, 1990, and signed by Mr. Boren, the physicians' assistant whom Dr. Poskitt assigned to the decedent, states that the deceased was seen after being referred by Dr. Poskitt and "in the writer's opinion this person will always need medications and will therefore place him in Protocol for Valium 5mg and Percocet." [8] *Id.* at 138.

6. An entry on June 25, 1990 states: "will change protocol ... start MS Contin 30 mg [every] 12 H—MS Sulfate Elixir [every] 4 H[for] breakthrough pain." [9]

7. An entry on September 27, states: "Protocol pain meds—takes 30 mg MS Contin TID, but also has to use liquid morphine 3–4 X day—runs low at times. Per Dr. Poskitt, increase MS Contin to 60 mg every 12 H, increase MS liq to III tsp every 1 to 6 H." *Id.* at 127. (Upward pointing arrows in the entry are interpreted by the court to mean "increase".)

8. An entry on November 13, 1990, shows an increase of the MS–Contin, but the court cannot interpret how much, and also an increase of the Morphine liquid to "3–4 tsp. [every] 4 H." *Id.* at 193. Dr. Poskitt testified that this entry increased the MS–Contin to 90 mgs twice a day.

9. An entry on April 25, 1991 reads, in part, as best as the court can read it: "P [symbol] MS Contin to 4 tab BIQ." *Id.* at 119. Dr. Poskitt testified this operated to increase the MS–Contin to 120 mgs twice a day.

10. An entry on what is believed by the court to be March 12, 1993, indicates that the MS–Contin dosage is increased to 180 mgs twice a day. *Id.* at 171. Dr. Poskitt so testified and further testified that this dosage of MS–Contin remained constant until the decedent's death.

11. A note dated November 21, 1990, states that decedent was evaluated by Dr. Wheeler who discovered the need for a bowel regimen to stabilize bowel function, etc. *Id.* at 126. Another note dated January 4, 1991, recited that possible colon resection was discussed with Dr. Wheeler for poor peristalsis, etc. *Id.* at 125.

12. A note dated March 5, 1991, recited: "L lower leg edema to knee—L foot purplish in color—Venogram telephonically reported as 'normal'. Dr.Poskitt also examined patient—no cellulitis—advised elevation time site." *Id.* at 122.

13. A written Treatment Protocol, dated November 21, 1991, signed by Dr. Poskitt and Thurmon Howard, Chief, Pharmacy Service, provides for "MS Contin 30 mg # 240 per month and MS Elixir 3000 ml per month." *Id.* at 111. This is the only formal, written protocol contained in the VA Medical Records in evidence.

---

**8.** Valium and Percocet are synthetic opiates. A protocol contains among other data a list of drugs that includes one or more controlled substances which is prescribed for a patient's use.

**9.** MS–Contin is a morphine tablet that time-releases its contents into the patient's blood over about a twelve-hour period so that the level of morphine in the blood stays constant during that period. MS Elixir is a liquid morphine that enters the blood soon after its ingestion and acts more quickly to control "breakout" pain, *i.e.,* pain that exceeds in intensity the abnormally high threshold of algesia produced by the MS–Contin. The episodic occurrence of breakout pain is common in patients such as the decedent.

14. A note dated May 20, 1992, states that the patient "is one week early for Protocol med. refill, due to spillage of MS liquid. Refill Protocol meds as before." *Id.* at 106.

15. A note dated August 4, 1992, signed by Dr. Poskitt recites that Doug Boren is on leave; the Morphine Elixir, MS C and Valium are to be renewed as per protocol; and that the decedent is to return to see Doug Boren in 30 days. *Id.* at 104.

16. A note dated April 2, 1992 states: "Surgery: foot ulcer much more extremis today [unreadable] debrided by me—needs inpatient care but he refuses admission." *Id.* at 99. The signature is unreadable.

17. A note dated April 14, 1993 states: "Mr. Rubin was counseled on the use of his/her medication with (FAIR, POOR, GOOD) understanding." The words "fair, poor" are encircled and the note is signed by Chris Waugh, Pharmacist. *Id.* at 96.

18. A note dated May 7, 1993, states: "Surgery: R foot [unreadable] much cleaner since 1 debrided it 4–5 wks ago. Good granulating tissue." *Id.* at 96. The signature is unreadable.

19. A note dated May 14, 199__ reads: "Mr. Rubin Jerry—was counseled on the use of his medication with GOOD understanding." It is signed by James R. Ward, Pharmacist.[10] *Id.* at 94.

20. A note of October 9, 1993, states that a rectal examination of decedent was normal; "a Ba E[nema] was ordered and patient was given verbal et [sic] printed instructions for preparation of that enema. He verbalizes clear understanding." Signed by Robert L. Glass and by Dora Akers, LPN. *Id.* at 89.

21. A record on November 8, 1993, bearing the signature of Dr. Poskitt, indicates his approval of Cathy Brammer's request that for six month's decedent be visited daily, five times per week, by a nurse for skilled assessment, for dressing change and to change his catheter every two to four weeks; that the decedent be provided Aide care for Personal Hygiene three times per week; and that there be a social service intervention to assess decedent's home situation and to make necessary community referral. *Id.* at 88.

22. An entry dated November 12, 1993, signed by Cathy Brammer, states that a nurse had called to say that patient, the decedent, has decided not to have Home Health care; that patient lives in a very large brick rancher that has not been taken care of; that his sheets look like they have not been changed in several months; that cat and dog hair is all over bed; the patient likes to stay in bed; and that an air mattress was ordered to help keep pressure off of his foot while he is in bed. The nurse also stated that she would not continue visits since patient has refused services. *Id.* at 84.

23. A note dated February 23, 1994, reads: "right foot ulceration seen infected—continue antibiotic salve and apply daily whirlpool." And one dated March 21, 1994, eight days before the decedent's death, states: "Since last seen [decedent] has had local debridement of foot ... Feels better than usual lately—Refill Protocol meds." The notes are signed by Doug Boren and by a person whose signature is unreadable. *Id.* at 79.

24. The decedent's VA Records also reflect that the following laboratory studies concerning the decedent's condition were conducted at the VA Medical Center: blood, on April 28, 1992, *id.* at 237–40, and on October 13, 1992, *id. at* 233–36; coagulation, on May 6, 1992, *id.* at 241–43; a urinalysis on October 26, 1992, *id.* at 245; plasma, on November 22, 1991, January 7, 1992, *id.* at 251–52, and February 28, 1992, *id.* at 247; vascular, on November 21, 1991, *id.* at 253–56; X-rays of legs, ankles, abdomen, right foot and chest on June 15, 1993, *id.* at 258; venogram on March 12,

**10.** Notes reading the same, signed by the same or other Pharmacists, appear frequently in the VA Records.

1991, *id.* at 267; and X-rays of lumbar, cervical and a thoracic spine on November 16, 1989, *id.* at 268–70. He was also given an eye examination and furnished eyeglasses on September 11, 1991, *id.* at 276, and was furnished a motorized wheelchair on November 23, 1990. *Id.* at 286.

His VA Records also contain two reports from Henry C. Goodman, M.D. P.S.C., of Ashland, Kentucky; one dated November 7, 1990, states that decedent has no effective use of his left leg and no effective control of his anal sphincter, *id.* at 284, and the other dated April 18, 1990, wherein Dr. Goodman remarks concerning decedent's rapid progression of loss of neurologic function. *Id.* at 289–90. A report dated April 18, 1990, from Colin C. Craythorn, M.D., an orthopedic surgeon of Huntington, West Virginia, to the VA Medical Center states that "compared to my last examination [on February 24, 1988] decedent's condition has deteriorated considerably." *Id.* at 291–92. Those records also reflect that during the period Dr. Poskitt and Mr. Boren managed the decedent's pain regimen, the decedent was seen and treated by several physicians at the VA Medical Center.

Obviously, the decedent did not lack for medical attention during the period he was under the care of the employees at the VA Medical Center.

25. The decedent was compos mentis at all times when he was interviewed, treated and had his ills and medications and the risks thereof explained to him by personnel at the VA Medical Center. Dr. Poskitt testified he always found the decedent so and the many notes in the record indicated that he had a good understanding of the pharmacist's explanations to him concerning his medications.

There is nothing in any of those records from which one could draw a contrary conclusion. He had completed one year of college and presumably was reasonably intelligent.

26. It was altogether appropriate for Dr. Poskitt to designate physicians' assistant Boren to aid him in his treatment of the decedent and no negligence on his part attended his doing so.

27. When the decedent refused home nursing and other care, he was at end stage, as Dr. Lilly testified, and Dr. Poskitt had no option but to continue to treat him as best he could as an outpatient. Dr. Poskitt testified that he had no authority to force the decedent to become an inpatient at the VA Medical Center.

Unlike a private physician, a physician at a VA Medical Center occupies a unique role in treating a veteran and cannot abandon a patient who refuses to submit to the care he recommends with the same impunity with which a private physician, such as Dr. Heit who testified that in a like circumstance [decedent's refusing inpatient and home health care] he would have ceased to be the patient's physician and would have told him to find a new doctor, could have done so. Had Dr. Poskitt done so, given the seriousness of the decedent's condition, the VA's providing free drugs to him and the unavailability of any other physician who practiced the treatment of intractable, non-malignant pain locally, the court feels confident Dr. Poskitt would have subjected himself to sore censure

## Conclusions of Law

In *Bellomy v. United States*, 888 F.Supp. 760 (S.D.W.Va.1995), Chief Judge Haden wrote a scholarly and thorough synopsis of the leading decisions of the West Virginia Supreme Court of Appeals applicable to medical malpractice cases. Nothing would be gained by this court's replowing that ground. The following statements of law quoted from the *Bellomy* decision remain topical and equally applicable to the case at bar:

> Disposition of actions arising under the FTCA is to be made pursuant to the tenets of law applicable in the state where the negligent act or omission is alleged to have occurred. *Miller v. United States*, 932 F.2d 301, 303 (4th Cir.1991) ("A plaintiff has an FTCA cause of action against the government only if she would also have a cause of

action under state law against a private person in like circumstances. State law determines whether there is an underlying cause of action[.]"); *Dunbar Corp. v. Lindsey*, 905 F.2d 754, 757 (4th Cir. 1990) ("United States liability under the FTCA depends upon state law."); *Tolliver v. United States*, 831 F.Supp. 558, 560 (S.D.W.Va.1993).

888 F.Supp. at 763–64 (alteration in original).

*West Virginia Code* § 55–7B–3 (1986) defines the elements of proof necessary to make out a claim of medical malpractice in West Virginia:

"The following are necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care:

(a) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

(b) Such failure was a proximate cause of the injury or death."

*Id.* at 764.

The plaintiff bears the burden of proving negligence and lack of skill on the part of the physician [who] proximately caused the injuries suffered. *Hicks v. Chevy*, 178 W.Va. 118, 121, 358 S.E.2d 202, 205 (1987). *See W. Va.Code* S 55–7B–7 (1986) ("The applicable standard of care and a defendant's failure to meet said standard, if at issue, shall be established in medical professional liability cases by the plaintiff[.]").

*Id.* (additional citations omitted).

■ "Ordinarily, a claim of medical malpractice must be supported by expert testimony. *Lutz v. Estate of Hillier*, 574 F.Supp. 1032, 1033 (S.D.W.Va.1983) (Haden, C.J.)." *Id.* (Footnote and additional citations omitted).

To be admissible, the expert testimony supporting a plaintiff's medical malprac-tice claim need not be expressed in terms of reasonable *certainty,* but must be expressed at least in terms of reasonable probability. *Syllabus* Point 3, *Hovermale v. Berkeley Springs Moose Lodge No. 1483*, 165 W.Va. 689, 271 S.E.2d 335 (1980)("Where a physician is testifying as to the causal relation between a given physical condition and the defendant's negligent act, he need only state the matter in terms of a reasonable probability."); *Syllabus* Point 1, *Pygman v. Helton*, 148 W.Va. 281, 134 S.E.2d 717 (1964)("Medical testimony to be admissible and sufficient to warrant a finding of proximate cause of an injury is not required to be based upon a reasonable certainty that the injury resulted from the negligence of the defendant. All that is required to render such testimony admissible and sufficient is that it should be of such character as would warrant a reasonable inference that the injury in question was caused by the negligent act or conduct of the defendant."). *See Syllabus* Point 6, *Long v. City of Weirton*, 158 W.Va. 741, 214 S.E.2d 832 (1975)(Haden, C.J.)("Although an injured party is required to prove actionable negligence by a preponderance of the evidence, the law does not require that the plaintiff exclude every other plausible theory as to the cause and effect of the [injury]."). *Cf., Syllabus* Point 13, *Jordan v. Bero*, 158 W.Va. 28, 210 S.E.2d 618 (1974) (Haden, J.).

*Id.* at 765 (alteration in original).

■ "[ ]A [physician] is not required to exercise the highest degree of skill and diligence possible in the treatment of an injury or disease, unless he has by special contract agreed to do so.[ ]" *Id.* (quoting *Syllabus* Point 2, in part, *Schroeder v. Adkins*, 149 W.Va. 400, 141 S.E.2d 352 (1965), which in turn quotes *Syllabus* Point 2, in part, *Vaughan v. Memorial Hospital*, 100 W.Va. 290, 130 S.E. 481 (1925))(second alteration in original).

Where a physician does not specially contract to provide a higher degree of care, he or she "is required to exercise only such reasonable and ordinary skill and diligence as are ordinarily exercised by the average members of the profession in good standing and in the same general line of practice, regard being had to the state of medical science at the time [ ]" the cause of action accrued. *Syllabus* Point 2, in part, *Schroeder v. Adkins, supra; See Syllabus* Point 4, in part, *Browning v. Hoffman,* 86 W.Va. 468, 103 S.E. 484 (1920) ("If the [physician] adopts, in the treatment of a case, a method established and approved by physicians ... generally ..., at the time [of the treatment], and is not negligent or careless in its application, he is not liable for injuries caused by such treatment."). Thus "the controlling issue [in a medical malpractice trial] is whether [the physician] has exercised reasonable and ordinary care, skill and diligence, such as accords with the usual standards of the profession as practiced by accredited [physicians]." *Syllabus* Point 4, *Maxwell v. Howell,* 114 W.Va. 771, 174 S.E. 553 (1934).

*Id.* (alterations in original).

[ ]"If there are two or more approved methods of treatment of an injury of the kind committed to his care, [a physician] may adopt the one which, in his honest opinion, will be the more efficacious and appropriate under all the circumstances, and, in such case, he is not liable for an injury resulting from an error in his judgment, if there be one. He is not bound at his peril to adopt the best method."[ ] [*Syllabus* Point 5, *Browning v. Hoffman, supra.*] *See Syllabus* Point 3, in part, *Vaughan v. Memorial Hospital, supra* ("Where a physician exercises ordinary skill and diligence, keeping within recognized and approved methods [of medical care], he is not liable for a mere mistake in judgment".); *Syllabus* Point 6, *Dye v. Corbin,* 59 W.Va. 266, 53 S.E. 147 (1906), *supra.*

*Id.* at 766 (second & fifth alterations in original).

A plaintiff in a negligence action has the burden of showing the injuries complained of were proximately caused by the negligence. *Syllabus* Point 3, *Hartley v. Crede,* 140 W.Va. 133, 82 S.E.2d 672 (1954) ("To be actionable, negligence must be the proximate cause of the injury complained of and must be such as might have been reasonably expected to produce an injury."). *Accord, Syllabus* Point 1, *Wehner v. Weinstein,* 191 W.Va. 149, 444 S.E.2d 27 (1994).... The proximate cause of an injury has two dimensions: first, the injury resulting from the negligence must have been reasonably foreseeable to a prudent person; and second, the act or omission must have caused the injury. *Syllabus* Points 3 and 4, *Matthews v. Cumberland & Allegheny Gas. Co.,* 138 W.Va. 639, 77 S.E.2d 180 (1953).

*Id.* (additional citations omitted).

For the plaintiff to prove his case, he need not show his injury resulted solely from the physician's negligence. The plaintiff's burden of proof in a medical malpractice case is satisfied when the plaintiff shows the physician's "acts or omissions increased the risk of harm to the plaintiff and that such increased risk of harm was a substantial factor in bringing about the ultimate injury to the plaintiff[.]" *Syllabus* Point 5, *Thornton v. CAMC,* 172 W.Va. 360, 305 S.E.2d 316 (1983).

*Id.* (additional citations omitted)(alteration in original).

 The evidence established that at the time the decedent's intractable, non-malignant pain was being treated at the VA Medical Center there was no consensus among physicians practicing the art of controlling such pain as to which of several differing sets of standards then being used to do so was the appropriate one to be followed in order to control such pain. Indeed, it was not until 1997 that the American Academy of Pain Medicine and the American Pain Society published a set of such standards, (Defendant's Exhibit 4),

which the court assumes a majority of the members of those two bodies deemed to constitute an appropriate treatment plan for the treatment of such pain. Even then those two bodies acknowledged, in paragraph I, on page 6 of that publication, that "[t]here is currently no nationally accepted consensus for the treatment of chronic pain not due to cancer, yet the economic and social costs of chronic pain are substantial, with estimates ranging in the tens of billions of dollars annually."

And it was not until July 14, 1997, that the West Virginia Board of Medicine formally issued its Position Statement on the Use of Opioids for the Treatment of Chronic Pain. (Defendant's Exhibit 3.)

Dr. Poskitt had been practicing pain management since the 1970's, and prior to the time the decedent was treated at the VA Medical Center. Based upon his experience and the literature then available dealing with that art, he had devised what he deemed to be an appropriate and acceptable scheme or set of standards to follow in treating such pain there; and that scheme or set of standards was used by him to treat the decedent's pain at the VA Medical Center. That scheme or set of standards devised by Dr. Poskitt was very similar to the set of standards contained in the West Virginia Board of Medicine's Position Statement issued on July 14, 1997. Thus the evidence established that the treatment of the decedent's pain at the VA Medical Center by Dr. Poskitt, and the supporting staff of physicians and care providers who participated in that treatment, substantially complied with the set of standards contained in that Position Statement, issued on June 14, 1997, more than three years after the decedent's death.

Accordingly, the court finds and holds that the plaintiff has failed to prove by a preponderance of the evidence that the method of care and treatment adopted at the VA Medical Center by Dr. Poskitt and the other persons involved in treating the decedent there fell short of any method for such treatment that was then established

and approved generally by physicians then practicing that art. The plaintiff has also failed to prove by a preponderance of the evidence that any of those care givers were negligent or careless in applying those methods of treatment to the decedent. Therefore, plaintiff is not entitled to recover in this case.

■ Even if the evidence had established by a preponderance thereof, as it did not, that the care givers or any of them at the VA Medical Center negligently failed to provide appropriate and acceptable care to the decedent, the plaintiff still would not be entitled to recover herein because the evidence presented on the issue of the cause of the decedent's death failed to establish by a preponderance of the evidence that it was reasonably certain, or more probable than not, that any such negligent failure would have proximately caused or contributed to his death. Dr. Heit's testimony did not deal with the issue of the cause of the decedent's death. He testified that since he was not a toxicologist, he would defer to the conclusion of the toxicologist, Dr. Sopher, on that issue. Dr. Lilly expressed no opinion with reasonable medical certainty or probability as to the cause of decedent's death. Dr. Sopher, the Chief Medical Examiner of the State of West Virginia, concluded, without stating with reasonable medical or toxicological certainty or probability, that

> In consideration of the circumstances surrounding death, past medical history and findings noted upon body inspection and toxicologic examination, the death of Jerry Rubin, a 51 year old white male, is *considered due to probable morphine intoxication.* The decedent was a chronic morphine user due to remote lumbar injury. The decedent had a past history of depression related to his chronic debilitating illness. *The manner of death is considered undetermined as the possibility of suicidal ingestion cannot be eliminated.*

(Emphasis added).

■ It is such evidence as that contained in Dr. Sopher's report concerning

the cause of decedent's death which the Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), declared to be inadmissible for the reason, among others, that it is not sufficiently validated and, moreover, would likely confuse and mislead a jury. Thus, the contents of Dr. Sopher's report are not sufficient to establish by a preponderance of the evidence that decedent's death was the result of any negligence on the part of any of the care givers at the VA Medical Center, for which additional reason the plaintiff is not entitled to recover in this action.[11]

For the foregoing reasons the court will enter an appropriate order of judgment granting judgment herein in favor of the defendant and against the plaintiff.

The Clerk of this court is hereby directed to furnish a copy of this memorandum opinion to all counsel of record herein.

---

**11.** Dr. Sopher's opinion was not expressed in terms of reasonable or toxological certainty or probability. Were he of a mind to express it in those terms, the court feels certain that the plaintiff would have called him as a witness to testify to that effect.